UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-CR-38 (CRC) |
| RICHARD BARNETT also known as "Bigo Barnett," | |
| Defendant. | |

<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Richard Barnett to a sentence of 87 months in prison—at the top of the applicable 70-to-87-month Guidelines range—followed by three years of supervised release, as well as a $25,000 fine, $2,000 in restitution, and the mandatory special assessment of $455.

I.     INTRODUCTION

The defendant, Richard Barnett, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election,

injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Barnett was aware of the significance of January 6, 2021. He believed that the United States would be taken over by communists if President-Elect Biden became president and was prepared to do "whatever it takes," (as he said on social media), including occupying the Capitol, to prevent that from happening. To that end, Barnett anticipated violence on January 6. He declared on social media that he was prepared to fight anyone who opposed him, including law enforcement and/or the military. He prepared for that violence by arming himself with a stun device and a ten-pound steel pole, both capable of inflicting serious bodily injury. And then he traveled to Washington, D.C. with those weapons.

On January 6, Barnett followed through on his intent to stop Congress from certifying the 2020 presidential election by joining a mob and invading the U.S. Capitol. Carrying his stun device and ten-pound steel pole, Barnett penetrated all the way into the offices of the Speaker of the House of Representatives, stole government property, and threatened an officer, obstructing that officer's efforts to quell the riot. A photo of Barnett with his feet on a desk in the House Speaker's office suite was widely circulated and became one of the best-known images of that day, symbolizing the rioters having wrested control of both the hallowed space and the political process from the nation's elected leaders. Barnett exited the Capitol building only after being hit with chemical

---

[1] As of October 17, 2022, the approximate losses suffered due to the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

spray. Once outside, he gave multiple interviews boasting about his exploits and he used a megaphone to encourage other rioters to fight the police and occupy the Capitol like he had.

After January 6, Barnett sought to profit from his notoriety and criminal conduct. He sold autographed photos of himself in the Speaker's office suite. While in pre-trial detention, he directed his significant other to copyright the message he left on the desk he believed belonged to Speaker Pelosi: "Nancy, Bigo was here you biotch." He wanted to be able to sell merchandise with that statement on it, further glorifying January 6 and sowing disrespect for the law. His post-trial statements similarly show he is without remorse and would readily engage in similar conduct in the future.

The government recommends that the Court sentence Barnett to 87 months' incarceration for his four felony convictions (18 U.S.C. § 231, 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 1752(a)(1) & (b)(1)(A) and 18 U.S.C. § 1752(a)(2) & (b)(1)(A)) and four misdemeanor convictions (40 U.S.C. § 5104(e)(2)(C), 40 U.S.C. § 5104(e)(2)(D), 40 U.S.C. § 5104(e)(2)(G) and 18 U.S.C. § 641), which is at the high end of the advisory Guidelines' range of 70-87 months, and fine him $25,000. An 87-month sentence reflects the gravity of Barnett's conduct and the need to deter Barnett and others from obstructing the democratic process and dangerously interfering with the police in pursuit of their political beliefs in the future.

## II.    FACTUAL BACKGROUND

The government refers the court to the Statement of Facts filed with the Complaint in this case, ECF 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by

hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**A.     Richard Barnett's Role in the January 6, 2021 Attack on the Capitol**

*Barnett Prepares for Combat on January 6*

Barnett believed that the results of the 2020 presidential election were illegitimate, Trial Transcript ("Tr.") at 1611:19–21, and that the United States would descend into communism, socialism, and Chinese control if President-Elect Biden took office, *see, e.g.*, Tr. at 558, 894, 1438:17–1439:16; Government Exhibits ("GEX") 109, 208, 503, 521.

For weeks, Barnett prepared to come to Washington, D.C. on January 6 to fight against this perceived threat and stop the transition of power to President-Elect Biden. He posted on Facebook "I ain't going down easy," GEX 773, "[I'll do] Whatever it takes. Whatever it takes," *id.*, and "I came into this world kicking and screaming, covered in someone else's blood. I'm not afraid to go out the same way," GEX 547, and "Anyone, and I mean anyone, that does not support the constitution of the United States of America is my enemy and will be treated as such! Civilian, law enforcement or military." GEX 502.

He attempted to recruit others to his cause, which included posting messages on Facebook that demonstrated his specific knowledge of the Congressional certification scheduled for January 6, 2021, and his intent to disrupt it. For example, Barnett shared a digital flyer promoting "Operation Occupy the Capitol" and subtitled "Taking back our country from corrupt politicians" that was advertised as occurring on "Jan 6th, 2021" in "All 50 States" at "12:00 pm." GEX 522. The call-to-arms Barnett distributed used an image of the U.S. Capitol building being struck by

4

lightning as a backdrop along with hashtags "#WeAreTheStorm," "#1776Rebel," and "#OccupyCapitol." *Id.* The event advertisement also featured a quote justifying action to "overthrow the men who pervert the Constitution." by supporting the conclusion that President-Elect Biden won the election. GEX 522.

On December 31, 2020, Barnett purchased a ZAP Hike 'n Strike Hiking Staff, a stun device concealed in a walking stick, as well as cannisters of pepper spray, GEX 410–413, for his upcoming trip to D.C. *See also* GEX 523, 530, 530A. The Hike 'n Strike's packaging advertised that it "induces extreme pain," GEX 17A, which the manufacturer testified was a true statement, not mere marketing fluff, Tr. at 422:6-16. The device was capable of delivering 950,000 volts of electricity, which, depending on how long Barnett applied the shock, could immobilize his target, cause him/her to fall and become disoriented, or even knock him/her unconscious. GEX 440; Tr. at 426:1-16, 452:18-453:4. The device could also be used like a knife to stab someone with its "extreme spike electrodes," GEX 17A, 440; Tr. at 423:19-24, or it could be used as a blunt force weapon, Tr. at 1145:24-1146:13.

Before traveling to DC, Barnett experimented with the Hike 'n Strike's capabilities as an electricity weapon. He played with it himself, Tr. at 1455:18-1456:5, he showed it off to his partner and friends, Tr. at 1456:6-1457:6, and on January 3, 2021, he recorded a video that he posted on

Facebook in which he bragged that if he needed to, he could use it to "light you up with 950,000 volts," GEX 530A.



*Image 1: screenshot from GEX 530A showing Barnett demonstrating the electrical shock feature of the Hike 'n Strike.*

In addition to arming himself with the Hike 'n Strike, Barnett also attached an American flag to a ten-pound metal pole, which could be used as a weapon or "freedom implement." GEX 529, 531A. Barnett brought both the Hike 'n Strike and the ten-pound metal flagpole with him to D.C. and into the Capitol. In short, Barnett traveled to D.C. for January 6 with the intent to disrupt Congress, and he anticipated and prepared for violence. In his own words, Barnett "didn't drive all the way up here to sing kumbaya." GEX 532.

On January 4, 2021, Barnett traveled to D.C. from his home in Gravette, Arkansas with two associates. Tr. at 891, 1010, 1687:11–13. As soon as Barnett arrived in Washington, D.C., he began bragging about urinating on fire hydrants, GEX 537, to "mark[] our territory," GEX 539,

and show that "We aren't here to play. We own this. It is ours," GEX 536. *See also* GEX 545-6 ("I pissed on all the fire hydrants when I got here! DC knows who Bigo is."). During the evening of January 5, he demonstrated the Hike 'n Strike's electric shock capabilities in the hotel bar, leading to the bar being shut down. GEX 420, 421; Tr. at 390:15-19.



*Image 2: screenshot from GEX 420, capturing Barnett demonstrating the Hike 'n Strike's electrical shock feature to onlookers in the hotel bar*

On the morning of January 6, Barnett was captured on video shouting as he left his hotel, "We own this motherfucker . . . bring it on!" GEX 781.

### Barnett Approaches the Capitol Building on January 6

On January 6, 2021, Barnett and his two associates attended the "Stop the Steal" rally and then walked to the Capitol. *See, e.g.*, Tr. at 1443:5, 1463–64, 1514–1518; GEX 372, 380, 382.

Barnett carried his flag, attached to the ten-pound steel flagpole, and his stun device. GEX 372, 380, 382.



*Image 3: photograph of Barnett with his flag and ten-pound flagpole, GEX 703, capturing how he was dressed on January 6, 2021*

After the rally, Barnett and his associates joined the crowd that walked to the Capitol. When he arrived on the Capitol grounds, Barnett walked past multiple indicia that the area was restricted, including barriers, lines of officers guarding the Capitol, and officers fighting with and arresting rioters. *See, e.g.*, GEX 100, 401; Tr. at 215–241. He saw explosions and smoke. Tr. at 1525:16-19, 1526:1-2. He smelled chemical gas. He heard people screaming. He saw people

panicking. Tr. at 1525:18-19, 1526:1-2. He observed police in black head-to-toe riot gear. Tr. at 1530:3-5. None of this deterred him.

At some point Barnett became separated from his two associates and went looking for them. Tr. at 1537:17-22. As he approached the Capitol building, Barnett pursued and harassed a group of police officers who were repositioning from the West front of the Capitol; Barnett filmed his progress. GEX 741.



*Image 4: screenshot from GEX 741 showing Barnett harassing a group of retreating or repositioning USCP officers.*

Once on the East front, Barnett walked to, and ascended, the central staircase leading to the Rotunda Doors, otherwise known as the Columbus Doors, which were closed. *See, e.g.*, GEX 401, 740. Barnett joined a large crowd of rioters gathered outside those doors and agitating to get inside; he maneuvered his way into the center of that crowd, directly in front of the doors. *See id.* For at least five minutes, if not longer, he made no attempt to leave that throng of people, even though the doors were locked, even though rioters were pounding on them and breaking its windows, even though he supposedly had to go to the bathroom. *Compare* GEX 112 *and* GEX

9

401, 740. Instead, when the opportunity presented itself, he entered the Capitol. GEX 101, 401, 740.

 

*Image 5 (left): screenshot from GEX 401, cell phone video recorded by Barnett while in the scrum trying to enter the Capitol through the East Rotunda Doors*
*Image 6 (right): screenshot from GEX 740, cell phone video recorded by another rioter of the same mob outside the East Rotunda Doors, showing Barnett in the scrum*

At approximately 2:37 p.m., a rioter opened the doors from the inside and the crowd began streaming in. GEX 101, 112. At about 2:42 p.m., Barnett, continuing to film his progress, pushed forward with the crowd through the doors, recording himself saying "We have no choice! We have no choice!" on his cell phone, GEX 401, which he later hid from the FBI, Tr. at 898:8–899:9. Alarms loudly rang as Barnett entered the Capitol building with the stun device still secured to his

hip and carrying his ten-pound steel pole.[2] GEX 101, 112, 113, 401, 740. Once inside the building, Barnett immediately took out his cell phone, resumed filming, and walked directly into the Rotunda. GEX 101, 112, 113.

### Barnett Enters Speaker Pelosi's Office Suite

Barnett then proceeded to the offices set aside for use by the Speaker of the House, Congresswoman Nancy Pelosi. GEX 101, 105, 108, 109. While in the office that he believed was Speaker Pelosi's—but which in fact was adjacent to the Speaker's personal office and belonged to the Speaker's Director of Operations, Emily Berret—Barnett found an envelope addressed to a congressman bearing the Speaker's franking signature and stole it.[3] GEX 201, 202, 720–22, 730, 731; Tr. at 917:19–23, 1553:16–1554:4, 1593:10–11. Barnett then sat in the chair and posed for photos with his feet up on the desk, displaying the stolen envelope, and sticking out his tongue. *See, e.g.*, GEX 704–09, 720–22; Tr. at 77–84. Some of the photos captured the stun device at his

---

[2] Barnett stumbled as he entered the Capitol and briefly fell to the ground. He was not almost trampled to death by the mob, however, as he claimed on direct examination. *See* Tr. at 1543:16-1544:8 ("If they hadn't [helped him up] . . . I think I would have been dead."). Instead, as captured by the Capitol's surveillance footage, he was able to quickly stand back up, pull out his cell phone, begin filming, and walk into the Rotunda, without so much as brushing himself off or taking a few seconds to recover. *See* GEX 101 at 00:00-00:43.

[3] Emily Berret testified that she had not left the envelope sitting on plain view on the desk. Tr. at 79:21-80:8. Rather, when she left her office, it was on the credenza behind the desk, behind a display case for challenge coins and under a charging port. *Id.* at 80:12-24.

waist. GEX 704, 705. These photos were widely circulated, contributing to Barnett becoming one of the most well-known faces of the January 6 siege of the Capitol.



*Image 7: photograph of Barnett with his feet up on Emily Berret's desk in the office adjacent to Speaker Pelosi's, GEX 704*

Barnett also left a note for Speaker Pelosi that read "Hey Nancy, Bigo was here you biotch." GEX 153–55; Tr. at 97:18–25. In totality, Barnett's actions in Speaker Pelosi's office were similar to his conduct when he arrived in D.C.: just as he bragged about urinating on the fire hydrants to "mark[] his territory" in the most vulgar, disrespectful way possible, he behaved the same in Speaker Pelosi's office. By putting his feet up on the desk, stealing the envelope, and leaving the vulgar, implicitly threatening note, he claimed possession of the office of the Speaker of the House of Representatives, the third highest ranking person in our democracy.

Barnett spent 10 minutes inside the Speaker's office suite and only left when Metropolitan Police Officers ("MPD") forced him to do so. Even then, Barnett did not immediately comply with officers' orders to leave the Speaker's suite. After being told by one officer that he needed to leave,

12

he retorted, "You need to give up communism is what you need to do." GEX 201, 202. While the

officer was engaged with other rioters, Barnett went right back inside the office where he had taken

the pictures and stolen the envelope. GEX 109, 201, 202. Another officer quickly intercepted

Barnett in the office and redirected him out into the Rotunda. *Id.* Barnett eventually complied, but

not before warning the officer to "be a patriot," and threatening her not to be on the "wrong side"

or she would "get hurt." GEX 202.

### Barnett Impedes MPD Officers in the Rotunda

Barnett then re-entered the Rotunda. Realizing he had left his flag (and the ten-pound pole

to which it was attached) inside the Speaker's office suite, he joined a mob confronting a line of

police officers who were preventing rioters from accessing one of the Rotunda's four exits,

specifically the one that would have allowed Barnett to return to the Speaker's office suite. *See*

GEX 203, 204D, 205, 207; Tr. at 618:19–619:6. Barnett incessantly shouted at the officers to "be

a patriot" and demanded they retrieve his flag. GEX 203A, 204D, 205, 207. Having failed to

persuade the officers by questioning their patriotism, Barnett next tried appealing for sympathy,

and then tried bargaining with them, offering to help call off the rioters if the police would send

an officer to retrieve his flag. When none of that worked, Barnett escalated to threatening the

officers, specifically MPD Officer Terrence Craig, who was part of that police line. GEX 203A,

204D, 205, 207; Tr. at 615:24–618:13, 663:12–670:14. Barnett threatened to "make it real bad"

for Officer Craig, claiming "I'm fixin' ta bring 'em in," *i.e.*, that he was preparing to call more

rioters forward to challenge the police line. GEX 203A. At one point, Barnett flashed his stun

device at Officer Craig with the cap removed, revealing the device's sharp spike electrodes, which

Officer Craig saw and recognized as a weapon that could pose a serious danger to himself and others. GEX 203, 204A, 204B, 204C, 204D.



*Image 8: GEX 204B, a screenshot from GEX 204, capturing the moment Barnett flashed his stun device at Officer Craig*

At another point, making good on his threat to "bring 'em in," Barnett waved other rioters over to expand the mob confronting and threatening the police.



*Image 9: GEX 204C, a screenshot from GEX 203, capturing Barnett threatening to bring 'em in'' and beckoning the mob*

Barnett warned Officer Craig, "You all better get my flag. I'm gonna bring 'em in. They'll shove me right through here. I'll get my flag." GEX 203. Barnett's words and actions obstructed Officer Craig in his official duties. Officer Craig saw that Barnett was armed and he feared for his life. He had to keep his total attention on Barnett. He could not address other rioters. He could not help his colleagues, even when one fell down the stairs. He could not help other officers fighting with rioters elsewhere on the Capitol complex. He could not leave the line or divert his attention for any reason, lest Barnett break through.

Eventually, some members of the mob, including Barnett, breached the police line. In the immediate aftermath of that penetration, Barnett was hit with chemical spray from an unknown source and repelled again by the officers, after which he finally left the Capitol building. GEX 744, 745; Tr. at 1573:2–4. Barnett exited through the Senate Wing Door at approximately 3:13 p.m., about thirty minutes after he entered. GEX 101, 102, 750.

### Barnett Exits the Capitol Building but Remains on Capitol Grounds

Barnett was not done threatening the police. Once outside, Barnett, still carrying the stun device, approached a line of officers and shouted for other rioters to hear, "We're American citizens, we're patriots. Your boys maced me. This is my house, y'all maced me in my own house. This is gonna get real bad, not necessarily today, we're going to calm down and leave, but y'all gotta remember something. Y'all gotta pick a fucking side. This civil war, this isn't 'oh, somebody broke the law'—the fucking Communists have declared war on us, boys." GEX 208. Seeking to further encourage the chaos, Barnett remained on Capitol grounds, giving multiple interviews and making speeches bragging about his "takeover" of Speaker Pelosi's office urging the mob to

continue fighting because "this is a war." Barnett repeatedly showed off the envelope he stole from Speaker Pelosi's office, called the Speaker a "biotch," and laughed while describing how he "took over" her office. GEX 770, 771, 780.



*Image 10: screenshot from GEX 770, capturing Barnett—after he exited the Capitol building— attempting to inspire the mob to fight further by boasting about his occupation of Speaker Pelosi's office and theft of an envelope from her desk*

In one such interview, Barnett falsely stated, in reference to the envelope that he took from former Speaker Pelosi's office and was still carrying, "I didn't steal it, I bled on it because they were macing me[4] and I couldn't fucking see so I figured I am in her office, I got blood on her office, I put a quarter on her desk even though she ain't fucking worth it. And I left her a note on her desk that says 'Nancy, Bigo was here, you bitch.'" GEX 780; *see also* GEX 770, 771. A note that read as described ("Hey Nancy, Bigo was here you biotch.") was later found in Speaker

---

[4] Trial evidence revealed that Barnett was not hit with chemical spray until after he left the Speaker's suite and confronted officers in the Rotunda.

Pelosi's office. GEX 153–55; Tr. at 97:18–25. Barnett also used a bullhorn to give a speech to encourage the crowd outside the Capitol, declaring, "We took back our house, and I took Nancy Pelosi's office!" GEX 780.

Over the course of the multiple interviews, the listener can hear Barnett workshopping his story, his soundbites, his delivery, and his tagline. He was performing. Those recorded interviews in their multiple iterations reveal Barnett's consciousness of wrongdoing, and his almost immediate efforts to begin constructing defenses, no matter how implausible. The recorded interviews capture Barnett smiling and snickering as he claims he "was pushed in" to the Capitol, took the envelope merely because he "bled on it," and "didn't steal it" because he "left her a quarter." GEX 770, 771, 780. Each of these statements and acts also encouraged the mob onward by glorifying his conquest of Speaker Pelosi's office and by showing off his trophy.

### *Barnett Returns Home to Arkansas*

Barnett knew that he had broken the law. While driving home from D.C. back to Arkansas, Barnett turned off location services on his phone, hid his face with a mask, and paid cash. GEX 356–60; Tr. at 891–93. Barnett got rid of his phone and stun device in an unknown manner; the FBI never found them despite conducting multiple searches of Barnett's residence and the homes of his associates. Tr. at 897. Upon returning to Arkansas and learning that the authorities had

identified him as the man who had put his feet up on the desk in Speaker Pelosi's office, Barnett agreed to surrender to the FBI. Tr. at 872.

### Barnett's FBI Interview

After turning himself in on January 8, 2021, Barnett participated in a voluntary interview with FBI agents, at the beginning of which he turned over the envelope that he stole and admitted to entering the Capitol and Speaker Pelosi's office. Tr. at 872–873. The envelope was loose, not sealed in a plastic bag or any other container to protected himself or others from possible contaminants.

During the almost two-hour interview, Barnett admitted to some—but not all—of his criminal conduct on January 6. *See* Tr. at 888. Barnett stated that he believed that the 2020 presidential election had been stolen, that Joe Biden was beholden to China, and that the United States would descend into communism if Joe Biden was permitted to become president. Tr. at 893:14-894:22. Barnett described entering the Capitol on January 6, putting his feet up on a desk in Speaker Pelosi's office, taking an envelope from her office, which he claimed to have done because he got blood on it, and leaving shortly after getting maced. Tr. at 895:1-14. He treated his act of putting his feet on the desk like a joke, twice putting his feet up on the table at which he was sitting with the FBI agents and asking them, "Does this look familiar?" Tr. at 889:14-890:22; GEX 351.When asked if he regretted his actions on January 6, Barnett initially made a vague statement that maybe he shouldn't have gone into the Capitol, but quickly changed his mind and said words to the effect of, "'No, I really don't regret it. I would do it again.'" Tr. at 895:15-20. Finally, in the

presence of the agents, Barnett told his partner, Tammy Newburn, that despite the strong evidence against him, he expected to beat all of the charges "because I'm Bigo." GEX 358.

### Barnett Tries to Profit from His January 6 Conduct

Barnett tried two different methods to profit financially from his criminal conduct on January 6, 2021. First, during the period he was committed to pre-trial detention (*i.e.*, from January 8 through April 27, 2021, *see* ECF Nos. 7, 16, 29), Barnett instructed Newburn to copyright "Nancy, Bigo was here, you biotch" so that only he could sell merchandise bearing that catchphrase. Second, Barnett created a website—bigobarnett.com—in which he presented himself as a wrongfully prosecuted peaceful protestor, stoked fear that "if you . . . stand against the Biden Administration in any way . . . Congresswoman Alexandria Ocasio-Cortez will put you on a Gestapo [*sic*]-like list," and solicited donations for "his family expenses and his bills," along with his legal expenses. *See* Ex. A. Barnett also sold autographed photographs of himself with his feet up on what the thought was Speaker Pelosi's desk, a picture that he characterized as "the face of the new anti-federalist movement." The government does not know the full extent of what Barnett earned from these ventures because he has not submitted any documentation of his income to the Probation Office. *See* PSR ¶ 112.

### Barnett Testifies Untruthfully at Trial

At trial, Barnett repeatedly provided false testimony about material issues.[5] Barnett claimed that the stun device was not functional on January 6, 2021, because he had dropped it in

---

[5] Barnett also showed disrespect for the law during his trial testimony by repeatedly ignoring the Court's directions and talking over the Court and the prosecutor. *See, e.g.*, Tr. at 1764.

the shower after demonstrating it in the hotel bar the night before, and because he had taken the batteries out before carrying the stun device to and into the Capitol on January 6. Tr. at 1471–1474. Despite this claim, Barnett acknowledged that he carried the stun device into and within the Capitol and kept it tucked in his waistband for the entire day. Tr. at 1688–90. He further claimed that he brought the device with him, even though the stun capacity was allegedly not functioning, because he was "excited" about its capabilities as a walking stick because of his back pain. Tr. at 1684:12. This claim was in stark contrast to statements he made on a video posted to Facebook prior to January 6, in which he expressed excitement about the ability of the device to inflict a 950,000-volt shock on a person. GEX 530A. Barnett's claim that he brought the Hike 'n Strike to and into the Capitol building because of its capabilities as a walking stick to help his back pain is also contradicted by statements he made on social media that he bought the device to defend himself and his admission that he never once used it as a walking stick on January 6. This claim is also contradicted by the video evidence of Barnett, which shows Barnett walking around without using the stick as an aid and does not show any indication that Barnett was experiencing back pain. *See, e.g.*, GEX 101.

Barnett also testified falsely that he did not enter the Capitol voluntarily; he claimed that he had no choice but to enter, was pushed inside, and was nearly trampled as he entered. Tr. at 1728:15–1731:3. Barnett acknowledged, however, that he *chose* to ascend the Capitol's east center steps, walked into the crowd outside the door, and maneuvered his way through the crowd to a position in front of the doors, all on his own volition. Tr. at 1707:6-1713:18. And the evidence showed that Barnett was standing outside the door for over five minutes between the time the doors

were opened and the time he entered, ample time to extricate himself if he wished. GEX 112, GEX 401.

Barnett testified that he helped a young woman who was pinned against the door or wall, Tr. at 1542:5-23, but the government's video evidence showed no such interaction, GEX 101 at 00:00-00:43. The Capitol's surveillance footage also showed that Barnett was not almost trampled to death upon entry, as he claimed, but rather that he briefly stumbled, picked himself up, and immediately took his phone out, began filming, and walked into the Rotunda. GEX 101 at 00:00-00:43, 118, 355 at 00:00-00:33.

Barnett testified that the cap to his stun device came off when he fell while entering through the East Rotunda Doors, Tr. at 1544:11-1545:4, but this is contradicted by CCTV footage that shows no attempt by Barnett to retrieve the cap from the ground, GEX 101 at 00:00-00:43, as well as other video that shows the cap back on the device later in the day, GEX 780 at 00:17-00:25. When challenged with these contradictions on cross-examination, Barnett claimed, incredibly, that "there's a period that wasn't on video where I think somebody from the defense . . . said that I walked back looking for it." Tr. at 1726:12-19.

Barnett also testified that the reason he did not immediately leave the Capitol building after unwillingly entering was because he was looking for a bathroom, and that he only inadvertently entered Speaker Pelosi's office suite in the course of that search. Tr. at 1515:18-1516:23, 1546:21-1549:5. The evidence contradicted that claim. Capitol surveillance footage shows that Barnett

made no attempts to find or use the bathroom and never asked any officer for directions to a bathroom. GEX 101.

Barnett testified that he left the Speaker's office suite immediately upon being asked to, *see* Tr. at 1559:20-1560:4, but video evidence showed that this was false; instead, he disregarded an officer's directive to leave and had to be ordered out by another officer. GEX 201, 202. After being confronted on cross-examination with this inconsistency, Barnett testified "you asked did I immediately leave, and the answer is yes. Then I turned around and went back in to try and retrieve my flag. She stopped me at that time . . . I wasn't like holding on to a pole saying I'm not leaving." Tr. at 1734:2-9. Similarly, Barnett testified on direct that the reason he did not leave the Rotunda was because the police were blocking all of the exits and telling the rioters that they were not free to leave, Tr. at 1562:13-1563:9, 1741:11-1742:10, yet video evidence shows this was not true. GEX 203, 204, 823.

Barnett further made the absurd claim that he only took the envelope from Speaker Pelosi's office because he bled on it and was conscientiously trying to remove a "biohazard."[6] Tr. at 1750:12–1755:5. But Barnett never disposed of the envelope after removing it from Speaker Pelosi's office and then the Capitol grounds, never took any steps to seal it, and kept it until handing it to the FBI in conjunction with his arrest. Tr. at 1750:12-1754:11. Instead, Barnett held the envelope in his hand without any protection, displaying it to cameras after he left the Capitol. *See* GEX 770, 771, 780. And Barnett never disposed of the letter, instead carrying it with him out

---

[6] Barnett claimed that he had cut his hand on the sharp spike electrodes of the Hike 'n Strike, which caused his hand to bleed. Tr. at 1544:11-24.

of the Capitol, back to his hotel, and back with him to Arkansas, passing many trash cans along the way. Tr. at 1752:8-1753:6. When he turned himself in to the FBI on January 8, 2021, Barnett still had the stolen envelope and handed it to the FBI agents without placing it in any protective packaging; instead, he tossed it on the table to the agents. Tr. at 1753:9-1754:2.

Finally, Barnett testified that the cell phone he had carried and used to record events on January 6 was simply "lost" or "fell off a truck." Tr. at 1692:18–21, despite telling the FBI on January 8, 2021, that he gave it to an attorney, Tr. at 898:8–899:9, and that they would not find anything of value if they searched his home because he was "a smart man," Tr. at 899:1–7. When confronted with evidence undercutting his claims on the stand, Barnett repeatedly deflected, chalking up the contradictions in his testimony to "head trauma" (for which there was no evidence). *See, e.g.*, Tr. at 1676:23, 1685:8, 1704:9.

In addition to demonstrating his own willingness to lie under oath, Barnett also called on his long-time partner, Tammy Newburn, to do so on his behalf. Newburn testified that Barnett's phone had probably fallen off of their truck, Tr. at 1422-23, even though Barnett had already suggested to agents that he had hidden or destroyed it. Tr. at 898:23-899:9.

### *Barnett's Post-Trial Conduct*

Since the trial, Barnett has repeatedly demonstrated his lack of remorse and refusal to take responsibility for his actions. Barnett has consistently characterized his convictions as political persecution, asserted that Officer Craig perjured himself, claimed that the January 6 riot was a plot

to undermine Trump and his supporters, and blamed law enforcement officers for causing the violence and threats against them.

For example, on January 26-27, 2023, Barnett posted the following statements on Twitter, falsely characterizing the eight crimes on which he was convicted as mere "yelling at . . . DC police" and spreading other false narratives about January 6:



*Image 11: Tweet and response by Barnett, remorselessly minimizing his criminal conduct*

Similarly, on May 15, 2023, Barnett posted a statement on Twitter complaining that he has "been through 2 1/2 years of hell" during the pendency of his prosecution, describing the

participants in the January 6 riot as "innocent protestors," and mocking Officer Craig for that fact that Barnett's threats with a deadly weapon "scar[ed] him and hurt[] his feelings":



*Image 12: Tweet by Barnett, mocking the reaction of the victim of his conduct*

Barnett has regularly tweeted—or retweeted—claims that law enforcement officers were responsible for sparking and then escalating the violence against the rioters, both inside and outside the Capitol, and that the riot at the Capitol was a set up designed to trick well-meaning, law-abiding Trump supporters like himself into committing crimes. Even after the jury found him guilty of

eight crimes, rejecting his self-serving and false version of events, Barnett continues to promote the type of disinformation that sparked the January 6 riot in the first place.

Finally, in an additional effort to capitalize on his crimes and his notoriety/fame, three GiveSendGo accounts were created for Barnett that, at the time the PSR was written, had collectively raised over $25,000. PSR ¶ 115.

### *Destruction of Evidence*

As described above, the United States has been unable to locate either Barnett's cell phone or the stun device that he brought to the Capitol, despite conducting multiple court-authorized searches of Barnett's home and the homes of his two associates. During his interview with the government, Barnett implied that he had hidden his cell phone from them, stating that the FBI would not find anything at his home because he was "a smart man." Tr. at 898:23-899:9.

### *Injuries*

Although Officer Craig did not suffer any physical injuries as a result of Barnett's conduct, Barnett's interference with Officer Craig as Officer Craig attempted to fulfill his duties had a lasting and detrimental effect on Officer Craig. As Officer Craig testified at trial, Barnett' threatening conduct, in the context of Officer Craig being vastly outnumbered while responding to the chaotic and fluid situation, led Officer Craig to reasonably fear for his life. Barnett's conduct

also served to incite and embolden other violent rioters around him and his participation in this riot aided those rioters who did succeed in injuring officers and destroying property.

## III.    THE CHARGES

On December 22, 2022, a federal grand jury returned a superseding indictment charging Barnett with the following eight counts: civil disorder (18 U.S.C. § 231), obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)), entering and remaining in a restricted building with a dangerous weapon (18 U.S.C. § 1752(a)(1) & (b)(1)(A)), disorderly and disruptive conduct in a restricted building with a dangerous weapon (18 U.S.C. § 1752(a)(2) & (b)(1)(A)), entering and remaining in certain rooms in the Capitol Building (40 U.S.C. § 5104), disorderly conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)), parading, demonstrating or picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)), and theft of government property (18 U.S.C. § 641). On January 23, 2023, a jury found Barnett guilty of all eight offenses.

## IV.    STATUTORY PENALTIES

Barnett now faces sentencing on the eight counts of conviction: four felonies and four misdemeanors. As noted by the Presentence Investigation Report ("PSR") issued by the U.S.

Probation Office ("Probation"), paragraphs 119-26, 131-33, 150-55, Barnett faces the following

maximum penalties:

| Count | Offense | Max Prison Term | Max Term of Supervised Release | Max Fine | Mandatory Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 231(a)(3) | 5 years | 3 years | $250,000 | $100 |
| 2 | 18 U.S.C. § 1512(c)(2) | 20 years | 3 years | $250,000 | $100 |
| 3 | 18 U.S.C. § 1752(a)(1) & (b)(1)(A) | 10 years | 3 years | $250,000 | $100 |
| 4 | 18 U.S.C. § 1752(a)(2) & (b)(1)(A) | 10 years | 3 years | $250,000 | $100 |
| 5 | 40 U.S.C. § 5104(e)(2)(C) | 6 months | n/a | $5,000 | $10 |
| 6 | 40 U.S.C. § 5104(e)(2)(D) | 6 months | n/a | $5,000 | $10 |
| 7 | 40 U.S.C. § 5104(e)(2)(G) | 6 months | n/a | $5,000 | $10 |
| 8 | 18 U.S.C. § 641 | 1 year | 1 year | $100,000 | $25 |

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR includes one error. It does not include a Guidelines analysis for each felony count of conviction.[7] *See* PSR ¶¶ 36-75. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. Despite this error, the

---

[7] No Guidelines analysis is necessary for Counts Five, Six, and Seven because they are Class B misdemeanors to which the Sentencing Guidelines do not apply.

government agrees with the PSR's conclusion about the grouping of Counts One through Four and

Eight into one group, and agrees with the PSR's resulting Guidelines calculations.

### *Count by Count Guidelines Analysis*

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a)[8] | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Dangerous Weapon Was Possessed And Its Use Was Threatened | +3 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice[9] | <u>+2</u> |
| | **TOTAL:** | **15** |

<u>Count Two: 18 U.S.C. § 1512(c)(2) and § 2</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[10] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | <u>+2</u> |
| | **TOTAL:** | **27** |

<u>Count Three: 18 U.S.C. § 1752(a)(1) & (b)(1)(A)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2X1.1(a) | Adjusted Base Offense Level[11] | 25 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | <u>+2</u> |
| | **TOTAL:** | **27** |

<u>Count Four: 18 U.S.C. § 1752(a)(2) & (b)(1)(A)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Dangerous Weapon Was Possessed And Its Use Was Threatened | +3 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding the Administration of Justice | <u>+2</u> |

---

[8] Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, U.S.S.G. §2X5.1 calls for using "the most analogous guideline." Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers.

[9] *See* pages 17, 26 *supra*; *see also* Tr. at 891:19-893:9 (describing how Barnett disposed of his cell phone and the Hike 'n Strike so that the FBI could not find them despite two search warrants, calling himself "a smart man"); *see also* pages 19-23 *supra* (describing Barnett's multiple false statements under oath concerning material matters).

[10] For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B).

Two independent reasons justify this enhancement. First, Barnett threatened to cause physical injury to Officer Terrence Craig while standing up against Officer Craig's police line in the Rotunda in two ways. (1) Barnett verbally threatened to set the mob on the officers, and to have that mob push him through the police line if they did not fulfill Barnett's wishes; and (2) Barnett brandished his stun device to Officer Craig, who immediately recognized it as a weapon.

Second, because Barnett stole property, the injury/property enhancement applies based upon the defendant's own acts under § 1B1.3(a)(1)(A). In Count 8, the jury convicted Barnett of stealing the envelope from Speaker Pelosi's suite. "[D]amage" can be interpreted to include loss of usefulness. See American Heritage Dictionary of the English Language (5th ed. 2020) ("Destruction or a loss in value, usefulness, or ability resulting from an action or event."); Oxford English Dictionary (2021) ("Injury, harm; esp. physical injury to a thing, such as impairs its value or usefulness."). These definitions support a reading of "property damage" that includes theft because when property is stolen, the owner is harmed in his use and enjoyment of the property.

[11] The initial base offense level for this crime is 4 pursuant to U.S.S.G. §2B2.3(a), but the cross-reference at U.S.S.G. §2B2.3(c)(1) requires that "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense." Here, Barnett entered the restricted area of the Capitol complex (Count Three) for the purpose of obstructing the official proceeding in violation of 18 U.S.C. 1512(c)(2)—that is, stopping Congress from certifying the election (Count Two). The substantive offense is thus Count Two.

Accordingly, pursuant §2X1.1(a), the adjusted base offense level for Count Three becomes the base offense level for Count Two, which is 14, "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty," bringing the total offense level for Count Two to 25, which the cross-reference imports for Count Three.

|  | **TOTAL:** | **15** |

Count Eight: 18 U.S.C. § 641

| U.S.S.G. § 2B1.1(b)(16)(B) | Adjusted Base Offense Level[12] | 14 |
| U.S.S.G. § 3A1.2(a) | Victim of government employee and | |
| | Offense was motivated by such status | +3 |
| U.S.S.G. § 3C1.1 | Obstructing or Impeding | |
| | the Administration of Justice | +2 |
| | **TOTAL:** | **19** |

*Grouping Analysis*

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. The counts of conviction to which the Guidelines apply all group together for the following reasons:

a) Counts <u>Two</u> (obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2)), <u>Three</u> (entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1)), and <u>Four</u> (disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. 1752(a)(2)) all group because they involve the same victim: Congress.

b) Contrary to the PSR's recommendation, Count <u>One</u> (civil disorder, in violation of 18 U.S.C. § 231) groups with Counts <u>Two</u>, <u>Three</u> and <u>Four</u> because Barnett's interaction with Officer Craig, charged in Count <u>One</u>, embodies conduct which is

---

[12] U.S.S.G. §2B1.1(b)(16)(B): "If the offense involved . . . (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

a specific offense characteristic of Count <u>Two, specifically the +8 enhancement for threatening to cause physical injury</u>.

    c)   Count <u>Eight</u> (theft of government property, in violation of 18 U.S.C. § 641) embodies conduct that is treated as a specific offense characteristic of Count <u>Two, specifically the +8 enhancement for property damage</u>.

The final offense level is thus 27.

Ultimately, despite the PSR's failure to calculate an offense level for each count before conducting its grouping analysis, both the government and Probation arrive at the same total offense level of 27, the same criminal history category of I, and the same Guidelines range of 70 to 87 months. PSR ¶¶ 75, 80, 127.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Barnett's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Barnett's offenses, which are detailed above, were of the utmost seriousness and fully support the government's recommended sentence of 87 months of imprisonment.

The nature and circumstances of Barnett's offenses reveal that Barnett anticipated violence, prepared for it, recruited others, armed himself, and then threatened it to achieve his goals: blocking the certification of the 2020 presidential election, keeping President Trump in power, and

retrieving his flag. They show that even after exiting the Capitol, he continued to urge others to fight the police and obstruct Congress. They also show Barnett's brazen disrespect for every form of authority he encountered: from the hotel employees trying to enforce their mask mandate, the locked doors of the Capitol, the police officers directing him to leave the Speaker's office suite, and the police officers blocking part of the Rotunda. Barnett's subsequent hiding of his cell phone and refusal to credit the jury's verdict fit the pattern: Barnett recognizes no authority but himself and is willing to do "whatever it takes" to get what he wants, even if it requires harming others, stealing, or breaking the law.

### B.      The History and Characteristics of the Defendant

Barnett's crimes on January 6 are not his only criminal conduct. Barnett has three prior DUI convictions, though they do not impact his criminal history score due to their age. PSR ¶¶ 77-79. Based on the PSR, Barnett appears to have had a stable childhood and normal adulthood. *See* PSR ¶¶ 85-110. Nothing about his personal background explains his criminal conduct on January 6 or warrants any kind of variance.

In addition to his criminal conduct at the Capitol on January 6, Barnett's conduct afterward and at trial suggest concerning character deficits. First, Barnett adopted a remorseless, braggadocious attitude during his voluntary post-arrest interview with the FBI agents, during which he repeatedly joked about his conduct in Speaker Pelosi's office and admitted that despite the criminal charges, he did not regret his behavior on January 6 and would do it again. Second, he made comments to agents indicating his belief that he was above the law, or that he believed that he could get away with breaking the law because of who he was ("because I'm Bigo Barnett").

GEX 358. Third, in addition to lying under oath himself, Barnett called his long-time partner, Tammy Newburn, as a witness to testify that his cell phone had probably fallen off of their truck, in direct contradiction of his statement to FBI agents implying that he had hidden or destroyed it to keep them from finding it. Newburn's testimony suggests that Barnett may have suborned perjury. Finally, as discussed further below, Barnett's statements during and after trial have shown contempt for the legal system, a continued lack of remorse, and an unwillingness to accept responsibility for his actions.

C.   **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a substantial sentence of incarceration. Barnett's criminal conduct—which included throwing his feet up on the desk he believed belonged to the Speaker of the United States House of Representatives and threatening an MPD officer—was the epitome of disrespect for the law. To this day, Barnett continues to spread disinformation about the events of January 6, which perpetuates and magnifies the detrimental effects of that day. In addition to demonstrating Barnett's own lack of respect for the law, his social media posts broadly promote that disrespect to others.

D.   **The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the riot at the Capitol. Given Barnett's high profile and his use of that notoriety to continue stoking the fires that could lead to another riot in the future, this case in particular calls for a sentence that will deter others from emulating Barnett and using violence to achieve political goals.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Barnett's lack of remorse is evident from his post-trial Twitter false proclamation that the worst thing he did was "yell[] at cops who were attacking injuring and murdering innocent protestors" and his attempts to monetize and profit from his crimes. Barnett's words and conduct demonstrate that he—still—does not see anything wrong with his actions on January 6. During trial, Barnett stated that he regretted "two years of lost life, heartache for my family," Tr. at 1588:5-25, but regret over being caught and prosecuted is not the same as remorse for the crimes he committed or the harm he caused to Congress, its staff, the law enforcement officers who defended the Capitol, or the bedrock principles of democracy—like the peaceful transfer of power—that form the foundation of our country. Barnett's conduct negatively impacted all of those people, entities, and values, but he regrets none of it. For example, Barnett testified that he did not regret entering the Capitol, *id.* at 1590:7-11, adding his body to the mob, *id.* at 1590:22-23, interfering with the certification, *id.* at 1591:7-

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

1592:16, stealing the envelope from Speaker Pelosi's office, *id.* at 1593:10-13, or breaking through the police line in the Rotunda, *id.* at 1594:21-1595:4.

Taken together, Barnett's conduct on January 6, his testimony at trial, and his statements afterward suggest that Barnett believes his political violence was justified and he would resort to it again. Accordingly, the Court needs to impose a sentence that will achieve the specific deterrence that the jury's verdict has not.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district

38

courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[15] While no previously sentenced case contains precisely the same balance of aggravating and mitigating factors present here, the sentence in *United States v. Robertson*, Case No. 21-CR-34, is a helpful comparator.

In *Robertson*, the defendant was convicted of the same four felony offenses as Barnett and sentenced to 87 months of imprisonment. Robertson's Guidelines were 87 to 108 months, two

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

levels higher than Barnett's, because Robertson received a 2-level aggravating role enhancement that did not apply to Barnett. Otherwise, their Guidelines calculations were essentially identical.

Like Robertson, Barnett has no criminal history points and did not commit an assault. Like Robertson, Barnett's post-January 6 conduct exhibits a lack of remorse and a continuation of spreading falsities, including Barnett's claim on social media that his worst offense was "yelling" at officers, and that the officers he yelled at were "murdering innocent protestors."

Robertson received a 2-level aggravating role enhancement for organizing the trip to Washington, D.C. for several others, which Barnett did not. And Robertson threatened to cause physical injury by the manner in which he used his walking stick, whereas Barnett did not "use" his weapon, other than to display it.

In many respects, however, Barnett's conduct was worse than Robertson's. First, while Robertson did not make any express verbal threats, Barnett threatened to "make it real bad" for Officer Craig, claiming "I'm fixin' ta bring 'em in," *i.e.*, that he was preparing to call more rioters forward to challenge the police line. Second, although both Robertson and Barnett carried weapons, Barnett brought a far more dangerous one: Robertson used a wooden stick while Barnett brandished a stun device that he had purchased days earlier expressly for the events of January 6. Finally, though both destroyed evidence and so received an obstruction enhancement, Barnett engaged in additional and more serious obstructive acts. Barnett not only hid his cell phone, he repeatedly lied under oath at trial. Barnett, unlike Robertson, has sought to benefit financially from his crimes and infamy, not simply by fundraising appeals but also by seeking to trademark his catchphrase ("Nancy, Bigo was here, you biotch") and trying to profit from selling autographed

photographs. For all of these reasons, the government's recommended sentence of 87 months of imprisonment would not create an unwarranted sentencing disparity.

## VII.    FINE

Barnett's convictions under Sections 231(a)(3), 1512(c)(2) and 1752(a)(1) & (b)(1)(A) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). To determine whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, Barnett raised over $25,000 using three GiveSendGo accounts.  PSR ¶ 115.

## VIII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution

41

Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699

F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[16]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Barnett to pay $2,000 in restitution for his convictions on Counts One through Eight. This amount fairly reflects Barnett's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the

---

[16] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

43

defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a Guidelines sentence of 87 months in prison, followed by three years of supervised release, as well as a $25,000 fine, $2,000 in restitution, and the mandatory special assessment of $455.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ Alison B. Prout
ALISON B. PROUT
Assistant United States Attorney
Georgia Bar No. 141666
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
alison.prout@usdoj.gov
(404) 581-6000

/s/ Michael M. Gordon
MICHAEL M. GORDON
Assistant United States Attorney
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
michael.gordon3@usdoj.gov
(813) 274-6370

/s/ Nathaniel K. Whitesel
NATHANIEL K. WHITESEL
Assistant United States Attorney
D.C. Bar No. 1601102
601 D Street, NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7035