```
  1                    IN THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
  2
         - - - - - - - - - - - - - - - x
  3      THE UNITED STATES OF AMERICA,
                                              Criminal Action No.
  4                      Plaintiff,           1:21-cr-00038-CRC-1
                                              Wednesday, May 24, 2023
  5      vs.                                  2:06 p.m.

  6      RICHARD BARNETT,

  7                      Defendant.
         - - - - - - - - - - - - - - - x
  8

  9      _____

 10                  TRANSCRIPT OF SENTENCING HEARING
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
 11                    UNITED STATES DISTRICT JUDGE
         _____

 12      APPEARANCES:

 13      For the United States:        ALISON PROUT, ESQ.
                                       UNITED STATES ATTORNEY'S OFFICE
 14                                    75 Ted Turner Drive Southwest
                                       Atlanta, Georgia 30303
 15                                    (404) 581-6105
                                       alison.prout@usdoj.gov
 16
                                       MICHAEL M. GORDON, ESQ.
 17                                    UNITED STATES ATTORNEY'S OFFICE
                                       400 North Tampa Street
 18                                    Suite 3200
                                       Tampa, Florida 33602
 19                                    (813) 274-6370
                                       michael.gordon3@usdoj.gov
 20
                                       NATHANIEL K. WHITESEL, ESQ.
 21                                    UNITED STATES ATTORNEY'S OFFICE
                                       601 D Street Northwest
 22                                    Washington, D.C. 20530
                                       (202) 252-7759
 23                                    nathaniel.whitesel@usdoj.gov

 24
         (CONTINUED ON NEXT PAGE)
 25
```

```
 1     APPEARANCES (CONTINUED):

 2     For the Defendant:      JONATHAN GROSS, ESQ.
                               THE CLEVENGER FIRM
 3                             2833 Smith Avenue, Suite 331
                               Baltimore, Maryland 21209
 4                             (443) 813-0141
                               jon@clevengerfirm.com
 5
                               BRADFORD L. GEYER, ESQ.
 6                             FORMERFEDSGROUP.COM, LCC
                               141 I Route 130 South, Suite 303
 7                             Cinnaminson, New Jersey 08077
                               (856) 607-5708
 8                             bradford.geyer@formerfedsgroup.com

 9
       Court Reporter:             Lisa A. Moreira, RDR, CRR
10                                 Official Court Reporter
                                   U.S. Courthouse, Room 6718
11                                 333 Constitution Avenue, NW
                                   Washington, DC  20001
12                                 202-354-3187

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  This is Criminal Case
 3    21-38, The United States of America vs. Richard Barnett, and
 4    this matter is set for sentencing.
 5              Counsel, please approach the lectern and identify
 6    yourselves for the record starting with the government.
 7              MS. PROUT:  Good afternoon, Your Honor; Alison
 8    Prout on behalf of the United States, and joined at counsel
 9    table is AUSA Michael Gordon and AUSA Nathaniel Whitesel.
10              THE COURT:  Ms. Prout, gentlemen, good to see you.
11              MR. GROSS:  Good afternoon, Your Honor; Jonathan
12    Gross representing Mr. Barnett, here with Brad Geyer.
13              THE COURT:  Okay.  Mr. Gross.  Mr. Geyer.
14              Mr. Barnett, good to see you.
15              THE DEFENDANT:  Good to see you, sir.
16              THE COURT:  Deja vu.
17              THE PROBATION OFFICER:  Good afternoon, Your
18    Honor; Sherry Baker on behalf of the probation office.
19              THE COURT:  Good afternoon, Ms. Baker.
20              All right.  The Court has read the presentence
21    investigation report, the parties' responses thereto, the
22    memos that have been submitted by both sides and their
23    supporting exhibits.  I've also reviewed letters from the
24    defendant's stepdaughter, his two nieces, his brother John,
25    and a number of friends and neighbors:  Mr. Sutherland,
```

```
1        Mr. Quye, Mr. Brooks, Ms. Halpin, and Mr. Hesse, who I
2        gather traveled with the defendant to D.C.
3                 THE DEFENDANT:  Yes, Your Honor.
4                 THE COURT:  Any other written materials for the
5        Court's review?
6                 MS. PROUT:  Not from the government, Your Honor.
7                 MR. GROSS:  No, Your Honor.
8                 THE COURT:  All right.  And is there anyone
9        planning to address the Court?
10                MR. GROSS:  I would like to address the Court.
11                THE COURT:  You can address the Court.
12                Any witnesses to address the Court other than
13       Mr. Barnett?
14                MR. GROSS:  No, Your Honor.
15                THE COURT:  Okay.
16                MS. PROUT:  Your Honor, we have the statements of
17       two victims that counsel will relay.
18                THE COURT:  Very well.
19                All right.  And if there are any guests or family
20       members in the courtroom, welcome, everyone.
21                All right.  Let's start with the factual findings
22       of the PSR regarding the offense.  There are a host of
23       objections by the defense.  I'm not going to go through each
24       one.  The bulk of the defense's objections consist of its
25       competing interpretations of the trial evidence.
```

1          The Court yesterday issued a 30-plus-page opinion

2     on the defense's motions for a new trial and judgment of

3     acquittal.  The Court reviewed much of the evidence and its

4     sufficiency to support the convictions.  The Court will

5     adopt the facts stated in its rulings, and they are

6     sufficient to satisfy the preponderance of the evidence

7     standard that is applicable here at sentencing.

8          The factual narrative in the PSR is consistent

9     with the trial evidence as the Court heard it and the

10    evidence summarized in the Court's rulings, but all of the

11    objections made by the defense are noted and will be

12    preserved in the record.

13         Mr. Barnett, has your counsel reviewed the

14    presentence investigation report with you?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  All right.  And have you been

17    satisfied with their services in this proceeding?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  All right.  With that, the Court --

20         THE DEFENDANT:  Your Honor --

21         THE COURT:  If you could pull the microphone

22    closer to you, that would be great.

23         THE DEFENDANT:  Your Honor, I do want to make the

24    Court aware now that there was some misinformation when all

25    the lawyers were withdrawing from my case.  Actually, Joe

1    McBride did not withdraw; I fired him.  And I'll be filing a

2    grievance against him, and I do not believe that he was

3    effective counsel.

4              THE COURT:  Okay.  Very well.

5              THE DEFENDANT:  Thank you.

6              THE COURT:  With that, the Court will accept the

7    factual findings in the presentence investigation report

8    regarding the circumstances of the offense; and, therefore,

9    those facts as stated in the PSR will be adopted by the

10   Court for purposes of sentencing.  And, again, the

11   defendant's objections will be reflected both in the report

12   and preserved for the record.

13             All right.  Moving to the Sentencing Guidelines

14   calculation.  The probation office used the 2018 guideline

15   manual; is that right?  The '21 manual.  The '21 guideline

16   manual.

17             There are eight counts of conviction.  The

18   probation office determined that five are subject to the

19   Sentencing Guidelines:  Count 1 for civil disorder; Count 2,

20   obstruction; Count 3, entering and remaining with a

21   dangerous weapon; Count 4, disorderly conduct with a

22   dangerous weapon; and Count 8, theft of government property.

23   The three misdemeanor offenses are not subject to the

24   guidelines, and so are not considered in the grouping

25   analysis.

1           Under Section 3D1.2(b) of the guidelines,

2      probation grouped Counts 2, 3, 4, and 8 because they

3      involved the same victim, namely Congress, and two or more

4      of the underlying acts were connected by a common objective

5      or plan, that being disrupting the orderly conduct of the

6      electoral vote certification.

7           Then, under 3D1.2(c) probation grouped those same

8      four counts with Count 1, which is the civil disorder count,

9      because the defendant's interaction with Officer Craig is a

10     specific offense characteristic of Count 2.

11          Therefore, there is only one group according to

12     probation, and probation applied the guideline that produces

13     the highest offense level, which is guidelines Section

14     2J1.2(a), the guideline for the obstruction of justice

15     count, 18 USC 1552(c).  That base offense level for that

16     guideline is 14.

17          Probation enhanced that base offense level based

18     on two specific offense characteristics.  The first, under

19     2J1.2(b)1(B), an eight-level enhancement because the offense

20     involved causing or threatening to cause physical injury to

21     a person in order to obstruct the administration of justice

22     based on the threats made against Officer Craig in the

23     Rotunda.

24          It then added, under 2J1.2(b)(2), three additional

25     levels because the offense resulted in the substantial

1    interference with the administration of justice due to the

2    interference with the certification proceeding as well as

3    the substantial resources that were needed to remedy the

4    proceedings on January 6th.

5          Probation then applied a two-level adjustment for

6    obstruction of justice under Section 3C1.1 of the guidelines

7    based on the defendant giving false testimony at trial.

8          All of that led to an adjusted offense level of

9    27.

10          The defendant had no countable criminal history.

11   The only criminal history reflected in the report were three

12   DUI offenses between 1989 and 2002 that were too distant to

13   be considered in the guidelines calculation.

14          So net, probation calculated the offense level at

15   27 at Criminal History Category 1 resulting in a guidelines

16   range of 70 to 87 months.

17          The government did not object to the substance of

18   the calculations but did object to the staging of the

19   grouping and the guidelines analysis.  I'm not going to make

20   a finding about that.  It does not affect the calculation of

21   the applicable range.

22          I've noted to probation that this issue has come

23   up in a number of cases.  I'm, frankly, not sure what the

24   right answer is, but I have suggested that either the

25   government or probation consult the Sentencing Commission so

1    that we don't go around the horn on this in every case, and

2    let's let the experts decide which one is the right

3    approach.

4              All right.  Mr. Gross, there are several defense

5    objections to the calculations.  Let's start with the

6    application of the eight-level enhancement.  Do you want to

7    be heard on that?

8              MR. GROSS:  Should I approach?

9              Your Honor, I think, for the purposes of this

10   hearing, I would rest on the written objections.  But that

11   said, I hope later I'll have an opportunity to be heard and

12   to discuss different comparable cases.  And we just have one

13   general objection that Mr. Barnett received this

14   outlandishly high score of 27, whereas people who did very

15   similar things were given as low as a 4 or a 6.

16             So we have our general objection, and the

17   specifics I'll leave to the papers.

18             THE COURT:  Okay.  The Court will apply the

19   enhancement for the reasons stated in the presentence

20   investigation report.  And, Mr. Gross, you can, of course,

21   argue for a variance based on the assertion that the

22   application of the eight-level enhancement overstates the

23   seriousness of Mr. Barnett's conduct.

24             MR. GORDON:  Your Honor, before you move on, may I

25   just add one thing to that?

1          Just for the record as it stands, as I intuit that

2     Mr. Barnett intends to appeal all of this, the government

3     does believe there are two other bases for the plus-eight

4     enhancement beyond the one that probation noted in Paragraph

5     56 of the PSR.

6          THE COURT:  Okay.

7          MR. GORDON:  So probation has focused in on the

8     threat of physical injury to Officer Craig.  Under that same

9     guideline, alternative bases would be aiding and abetting

10    the other rioters in the Rotunda who were also themselves

11    threatening Officer Craig and other officers who were in

12    that same process, either they were trying to block the

13    rioters from progressing further or expel them from the

14    building.  So the aiding and abetting is the second basis.

15         And then the third is the property damage one

16    focused on Mr. Barnett's theft of the envelope.  The

17    government's position is that is also a basis for applying

18    the plus-eight enhancement as that, too, could be read as

19    having interfered with the administration of justice.

20         Thank you, Your Honor.

21         THE COURT:  How does stealing the envelope affect

22    the administration of justice?

23         I can see the argument that impeding law

24    enforcement responding to a civil disorder or keeping law

25    enforcement from being able to clear the building in order

```
1    to resume the certification has a connection to the
2    administration of justice, but I don't get it with respect
3    to the envelope.
4              MR. GORDON:  Yes, Your Honor.  Mr. Barnett had no
5    way of knowing what the purpose of that envelope was.  He
6    didn't know that it was to hold a thank you note for a
7    holiday gift.  As far as he knew, it was a letter to -- he
8    didn't know what was inside.  For all he knew, it was a
9    letter to a Congressman about official government business.
10             So in stealing an enveloped that is addressed from
11   the Speaker of the House to another member of Congress, he
12   is engaged in a theft that, from his perspective, could be
13   interfering.
14             THE COURT:  Okay.
15             MR. GORDON:  Thank you, Your Honor.
16             THE COURT:  Thank you.
17             MR. GROSS:  Your Honor, may I be heard?
18             THE COURT:  Sure.  Make your record.
19             MR. GROSS:  Your Honor, I think in sports we call
20   this running up the score.  I think they had time to make
21   these points earlier, and they didn't.  And I just think
22   that's -- what they have should be sufficient, and this
23   should not be included.
24             THE COURT:  Okay.  All of the arguments made are
25   in the record and reserved for the Court of Appeals.
```

1          All right.  And, Mr. Gross, same thing on the

2     three-level enhancement?  You want to stand on your papers?

3          MR. GROSS:  Yes.

4          THE COURT:  All right.  So one argument that the

5     defense did not make -- it made an argument that the eight-

6     level enhancement does not apply as a factual matter in this

7     case, but it did not, unless I missed it, argue based on the

8     *Seefried* case and the -- what I understand was the position

9     of the appellant in the *Robertson* case before the D.C.

10    Circuit recently that the eight-level enhancement or the

11    three-level enhancement does not apply because the

12    certification proceeding does not constitute the

13    administration of justice.  That was not -- I applied the

14    exception or the enhancement in the *Robertson* case, but that

15    issue was not raised before me and so I didn't analyze it

16    thoroughly.

17         I've since gone back and taken a look -- I

18    obviously have an independent obligation to calculate the

19    guidelines accurately.  And so we've gone back and looked at

20    that; and while it is a somewhat close question, I've

21    concluded that it does apply here.

22         Perhaps not all official proceedings involve the

23    administration of justice, and Judge McFadden in the

24    *Seefried* case used the example of an inauguration that would

25    be an official proceeding that perhaps did not involve the

1    administration of justice.  But as a number of my fellow

2    judges have noted in upholding 1512(c) charges in January

3    6th cases, the congressional certification is not simply

4    ceremonial, and it involves quasi-judicial aspects like

5    receiving and resolving objections to the certification and,

6    of course, certifying the overall results.

7            So for that reason the Court finds that Congress's

8    actions fit within the definition of administration of

9    justice; and, therefore, as a legal matter it applies to

10   attempts to obstruct that proceeding.

11           Okay.  Mr. Gross, any other arguments you want to

12   make with respect to application of the guidelines that --

13   or are you going to stand on your papers?

14           MR. GROSS:  Regarding the guidelines, we intend to

15   ask for a variance.

16           THE COURT:  Okay.  Very well.

17           Okay.  Ms. Baker, I just want to be clear, there

18   was some ambiguity in the recommendation that the Court

19   received from the probation office.  Do you want to clarify

20   that?

21           THE PROBATION OFFICER:  Good afternoon, Your

22   Honor.

23           THE COURT:  Good afternoon.

24           THE PROBATION OFFICER:  Yes, I would.

25           THE COURT:  Okay.

1          THE PROBATION OFFICER:  Initially I had 60 months,

2     which is five years.  The correct is actually 54 months,

3     which is 48 months and -- 48 months -- I'm sorry, 54 months

4     total, which is four years and six months.

5          THE COURT:  Okay.  So the probation office

6     recommendation in the case which both parties have received

7     is 54 --

8          THE PROBATION OFFICER:  Months.

9          THE COURT:  -- months on Counts 1, 2, 3, and 4; is

10    that correct?

11         THE PROBATION OFFICER:  Correct.

12         THE COURT:  12 months on Count 8.

13         THE PROBATION OFFICER:  Yes.  And then of course

14    six months --

15         THE COURT:  And six months on the remaining

16    misdemeanor counts, all to be served concurrently.

17         THE PROBATION OFFICER:  Correct, Your Honor.

18         THE COURT:  And that's a variance from the

19    applicable guidelines range based on age, physical health,

20    and lack of violent conduct.  Is that fair?

21         THE PROBATION OFFICER:  Correct, Your Honor.

22         THE COURT:  Plus three years of supervised

23    release?

24         THE PROBATION OFFICER:  Correct.

25         THE COURT:  Okay.

```
1              THE PROBATION OFFICER:  Thank you, Your Honor.

2              THE COURT:  Thank you.

3              All right.  With that, Ms. Prout, would you like

4      to address the 3553(a) sentencing factors?

5              MS. PROUT:  Yes, Your Honor.

6              Your Honor, we're here today to talk about the

7      role of the defendant in the siege of the United States

8      Capitol on January 6th.  The Court is well familiar with the

9      events of that day; and therefore, as the government has

10     since trial, we would like to focus on the conduct of this

11     defendant.

12             We're going to talk about the nature and

13     circumstances of his offenses, his personal characteristics,

14     the need for deterrence in this case and avoiding

15     unwarranted sentencing disparities.  But before I get to

16     each of those elements, there's something that pervades all

17     of those topics that I'd like to highlight as a theme here,

18     which is the defendant's persistent refusal to accept

19     responsibility for his actions and to acknowledge the

20     gravity of his conduct.  And coupled with that, what we've

21     seen is his spreading of falsehoods about the events of

22     January 6th, and, frankly, his continued downright mockery

23     of the justice system that has brought him here.

24             And I've pulled out a few of the defendant's own

25     words and the words of his counsel to shine a light on this,
```

16

1   throughout pleadings, throughout his testimony, some of his

2   social media posts.

3           In his sentencing memorandum counsel sums up the

4   issue before this Court as, "Whether a few minutes of

5   conduct deserve over seven years in prison."  And as I'll

6   talk about, the government certainly sees this issue as far

7   more serious than "a few minutes of conduct."

8           In the same memorandum, defense counsel refers to

9   the note he left for Speaker Pelosi as "a juvenile joke, but

10  it was not a crime."

11          The memorandum acknowledges that January 6th is

12  unique in American history, but the reason provided is

13  simply because of the government's "relentless pursuit of

14  American citizens who were present at the Capitol on January

15  6th," with no acknowledgement to the harm that was wrought

16  on the Capitol itself or on our democracy on that day.

17          And in the defendant's own social media posts he

18  has claimed that police officers who responded on January

19  6th were "murdering innocent protesters."  And he claims

20  that the reason that he is here today being sentenced is

21  because he "yelled at one of the cops apparently scaring him

22  and hurting his feelings."

23          And with that backdrop, let me address why the

24  government believes we are really here today, and it is

25  certainly not because of hurt feelings or a harmless prank.

1          With regard to the nature and circumstances of the

2    offense, this was not, as defense counsel says, simply about

3    a few minutes of conduct.  The full scope of what this case

4    is about includes the fact that after President Biden won

5    the election the defendant started right away to brag on

6    social media about his preparations for violence and

7    encouraging others to participate.  And the Court noted some

8    of those examples in the order of yesterday.

9          The defendant began his preparations for his trip

10   to D.C. by at least December 31st.  He bought the stun

11   device.  He bought pepper spray.  He bought two-way radios.

12   In a separate Wal-Mart stop, he bought zip ties.  He

13   attached a flag to a ten-pound steel pole.

14          THE COURT:  Let me stop you there.  The defense

15   says there is no evidence that he brought the pepper spray

16   and the zip ties and the radios.

17          MS. PROUT:  Your Honor, I think --

18          THE COURT:  Is that true or not?

19          MS. PROUT:  What we have is the evidence he

20   purchased those items at the same time that he purchased the

21   stun gun.  We have -- from the search warrant, there was

22   packaging seen for the radios, but not the radios

23   themselves.

24          We don't have evidence that he had those on him at

25   the Capitol on that day, Your Honor, that's correct.

1          THE COURT:  And much of the physical evidence had

2     been disposed of by the time the search warrant was

3     executed?

4          MS. PROUT:  That is correct.  While the packaging

5     for the stun gun and the radios were found, the contents of

6     both of those packages were nowhere to be found.

7          We certainly know that he brought the ten-pound

8     pole and the stun device with him.

9          On January 6th itself, the defendant walked past

10    violent clashes between rioters and the police.  He talked

11    about some of that in both his filings and on the stand,

12    seeing clashes, seeing incidents, seeing some of the rioters

13    being arrested.  And he positioned himself at the doorway of

14    the Columbus doors joining the mob that was pounding on

15    those doors, standing out there for at least five minutes,

16    watching those in front of him pounding on the doors,

17    breaking the glass, and eventually joining that crowd that

18    entered the building.

19         He remained inside the building for 30 minutes.

20    And I'll come back to focus in on what happened inside the

21    building.  But as the Court knows, he only left the building

22    after being hit with chemical spray.

23         He brought along those deadly weapons, the stun

24    device and the metal pole, inside the Capitol.  And then,

25    once he came outside, he immediately began celebrating his

1   conquests, bragging to anyone who would listen, somehow

2   obtaining a bullhorn to broadcast his triumphs of conquering

3   Speaker Pelosi's office and showing everyone who would look

4   the trophy that he obtained, which was the envelope that he

5   took from her office.

6            Not only was this bragging, but this was

7   encouraging others on because the riot was still in active

8   commission while he stood out there and encouraged the other

9   rioters.

10           After leaving the grounds that day, the defendant

11   immediately took steps to tell lies, minimize his own

12   conduct, attack the police who risked their own lives to

13   defend our lawmakers and our Democratic institutions that

14   day, and drawing accusations of the police as "murdering

15   innocent protesters."

16           So this case is about January 6th, of course, but

17   it's also about the days and weeks before and after that the

18   defendant took to prepare and then to spin the tale of what

19   happened.

20           And now let me focus, of course, on what happened

21   inside the Capitol.  There are two separate events that were

22   significant for very different reasons:  his actions in

23   Speaker Pelosi's office suite, and his actions in the

24   Rotunda.  And I want to briefly address both of those.

25           With regard to the actions in Speaker Pelosi's

1    office suite, the defendant has said that he's here today

2    because of a picture, and the government is seeking harsh

3    justice because a picture happened to make him famous.

4         The truth is that the defendant did not happen to

5    become famous because of that picture.  It's the exact

6    opposite.  The picture became famous, became what it is,

7    because of the defendant's conduct, because the defendant

8    was there at that moment and because of what that

9    represented.

10        The picture sent shock waves around America and

11   around the world because this defendant literally took over

12   the head of the American Congress's office, the seat of

13   American democracy, and he did so at the very moment that

14   the constitutional transfer of power was underway.

15        My colleagues know that I've been trying to think

16   of an analogy to drive home the serious momentousness of

17   that event, but the sad thing is I think what I concluded is

18   there actually is no comparison because America has stood

19   alone as the greatest Democratic super power in the world

20   for many years, and so to try and compare this to someone

21   walking into the office of another seat of government on

22   another day, it really falls short of capturing the

23   seriousness of what that meant.

24        THE COURT:  Well, you know, I'm sure I'm going to

25   hear this from the defense, but, you know, it's illegal to

1    be where he was, but it's not illegal to respond to a *New*

2    *York Times* photographer who tells you, "Hey, man, go sit at

3    the desk and pose for the picture."  Right?

4           MS. PROUT:  Absolutely, Your Honor.  And, again,

5    this is not about -- I'm sorry, go ahead.

6           THE COURT:  And if there weren't other conduct, we

7    wouldn't be talking about the time that we're talking about

8    for just him being on the front of the paper, right?

9           MS. PROUT:  Yes, Your Honor.  We are not here

10   because he was on the front of *The New York Times*.  We are

11   here because he, along with others, certainly, but he played

12   a very important role in interrupting what was going on that

13   day.  And as Your Honor saw in the videos at trial, his and

14   the others' presence in the Speaker's office that day led to

15   multiple staffers literally running and hiding and staying

16   hidden in a safe room for hours until that office could be

17   cleared and until it was safe for them to return.  And

18   that's not because of any picture that was taken.  That's

19   because of what he did and where he was.

20          And the defendant has characterized what he did as

21   "a juvenile joke."  That's what he said about the note that

22   he left.  But not a crime.  He says that he was guilty of

23   bad taste.

24          But nothing about the defendant's presence in the

25   office of the Speaker of the House of Representatives is a

1    joke.  It was certainly not the most violent act that took

2    place that day --

3              THE COURT:  Hold on.

4              Mr. Gross, Mr. Geyer, if you want to communicate,

5    why don't you write a note.  I'm trying to devote my

6    attention to the government at this point.  You'll have your

7    chance to address the Court.

8              MR. GEYER:  I'm sorry, Your Honor.

9              THE COURT:  Go ahead.

10             MS. PROUT:  Of course it was not the most violent

11   action that took place that day, but it was deadly serious,

12   and it has had very serious consequences for the world's

13   confidence in America's democracy and its stability.  And

14   for the defendant to say in his filings that he's being

15   unfairly persecuted by the government for a juvenile joke

16   makes crystal clear that he continues to refuse to

17   acknowledge the gravity of his actions and that the need for

18   specific deterrence in this case remains paramount.

19             As Your Honor has already foreshadowed, his

20   actions in the Speaker's office were not all that he did

21   that day.  After being made to leave the Speaker's office,

22   he went to the Rotunda.  And the Court will vividly remember

23   his conduct there, including the pushing that ensued among

24   that crowd; not by the defendant, but by the crowd.

25             The defendant joined at the front of a crowd of

1   rioters facing off against a line of officers.  Those

2   officers were vastly outnumbered.  They were trying to keep

3   the rioters from returning to the area of the Speaker's

4   suite.  And as you may recall from Officer Craig's

5   testimony, they had a steep staircase right behind them

6   limiting their options and their mobility.  And the

7   defendant invaded their space, he flashed his weapon with

8   the spikes exposed, and he repeatedly threatened the

9   officers.

10          He threatened to make it real bad for the police

11  and to bring in the crowd.  And as the Court observed in its

12  order, the defendant threatened Officer Craig at least 15

13  times.

14          You heard from Officer Craig about how this

15  affected his and the other officers' ability to do their

16  jobs.  You heard how Officer Craig was scared.  And I think

17  the Court saw that Officer Craig was no shrinking violet.

18  It was not comfortable for him to come and sit here in this

19  full courtroom and acknowledge how frightened he was at that

20  moment.

21          THE COURT:  Okay.  Let's just stop there because

22  obviously the interactions with Officer Craig are the basis

23  for the eight-level enhancement either on a principal theory

24  or an aiding and abetting theory.  You know, that's a pretty

25  heavy cudgel, eight levels, and it encompasses a broad range

1    of behavior, right?  It could be, you know, nonverbal

2    threats, as was the case in the *Robertson* case that I tried;

3    or it could be, you know, shooting a judge or shooting a

4    witness.  All right?

5            Where does his conduct fall within that eight

6    levels?  You're not going to tell me it's at the very top,

7    right?  And so, you know, how should I assess where within

8    that eight-level range Mr. Barnett falls?

9            MS. PROUT:  I think it's a fair question.  And

10   you're certainly right that there are other more aggravating

11   types of conduct that could also qualify for the eight

12   levels.

13           I think if the conduct had involved physical

14   injury to an officer, there may very well be some additional

15   enhancements that would apply.

16           THE COURT:  So many of the enhancements in the

17   guidelines have steps, you know, for --

18           MS. PROUT:  Right.

19           THE COURT:  -- minor participant, minimal

20   participant, you know, and you can sort of walk your way up.

21           This one, it's eight or nothing.  So that's not

22   terribly helpful to the Court, frankly.  So that's one of

23   the things that I struggled with in that case and I've

24   struggled with a little bit here.

25           MS. PROUT:  I think that's valid.  I think there

1    are a few things to take from that.

2          One is that the commission could have made steps

3    but didn't because there are certain moments that are of

4    such high tension, high import, that when some enhancing

5    behavior occurs, it's that serious.

6          I think this is exactly the type of such a

7    situation where, when the enhancing behavior occurred that

8    created threats to the officer, the consequences and the

9    ripple effect were that serious.

10          That's not to say --

11          THE COURT:  But if I find that the application of

12    the eight levels plus the three levels --

13          MS. PROUT:  Yes.

14          THE COURT:  -- which hinges also on administration

15    of justice results in a range that overstates the

16    seriousness of a defendant's conduct for some reason, I

17    assume you would agree that I could vary on that basis.

18          MS. PROUT:  The Court is certainly free to vary

19    based on all of the 3553 factors.

20          It's the government's position that the

21    defendant's conduct does fit squarely within the

22    enhancements contemplated in both the plus-eight and the

23    plus-three.  And as the Court knows, the government has

24    recommended a high-end guidelines sentence; and I'll address

25    our rationale for that in a moment.

1            But it is our position that his conduct falls

2     squarely within both of those enhancements.

3            THE COURT:  All right.  Speaking of the eight-

4     level enhancement, did you have an opportunity to read the

5     transcript of the hearing in the *Robertson* case at the Court

6     of Appeals?

7            MS. PROUT:  I reviewed the transcript before this

8     Court, but not the transcript at the Court of Appeals, Your

9     Honor.

10           THE COURT:  Okay.  Well, I have not done that

11    closely, and I guess my question is:  Did you get a sense of

12    where the circuit might come out on the merits of the

13    question that was not raised by the defense, which is

14    whether the certification proceeding is, in fact,

15    administration of justice?

16           MS. PROUT:  Having not read the hearing, I don't

17    want to speculate on that, unfortunately.

18           THE COURT:  Okay.

19           MS. PROUT:  At this point, where we stand today, I

20    think all authority points toward applying those

21    enhancements.

22           With regard to the conduct and as it impacted

23    Officer Craig, again, I think what's important here is even

24    though no physical steps were taken against the officer, the

25    conduct itself was very serious in that it prevented Officer

1    Craig from assisting another officer who had been pushed

2    down the stairs.  It prevented Officer Craig from leaving

3    that station and joining other officers who were engaged in

4    hand-to-hand combat on the West Front and elsewhere

5    throughout the building, and it caused Officer Craig to keep

6    his attention focused on the defendant rather than turning

7    his attention to others who were right there who were

8    equally threatening some of the other officers present.

9           The defendant's attitude about that conduct, I

10   think, is also informative.  During cross-examination, it

11   was suggested that since Officer Craig physically outweighed

12   the defendant it was unreasonable for him to be alarmed at

13   what was going on.  I think that completely fails to take

14   into account the extent to which these officers were

15   outnumbered, under-equipped, and doing their darn best to

16   respond to an event that nobody could have foreseen.

17          While on the stand, the defendant described his

18   conduct with Officer Craig as simply acting like a

19   four-year-old and making stupid nonsensical threats.  Again,

20   I raise this because it suggests that the need for specific

21   deterrence is essential.

22          And since then, the defendant has made numerous

23   Twitter posts mocking Officer Craig for what the defendant

24   says is having hurt feelings.  The defendant wrote in one

25   Twitter post, "Having already been through two and a half

1    years of hell" -- he's referring to himself, the defendant,

2    not the officer victim -- "I'll be in court soon for

3    sentencing because, after witnessing all the carnage

4    unleashed on innocent protesters, I was shaken up to the

5    point that I yelled at one of them apparently scaring him

6    and hurting his feelings."

7            That's an insult to the victim/officer who risked

8    his life to protect the members of Congress and the others

9    in the Capitol that day.

10           And that post, Your Honor, was made on May 15th,

11   less than two weeks ago.  I think that's telling because

12   those are the Twitter posts the defendant is making right

13   before this sentencing.

14           And the defendant is a savvy man, and he's

15   certainly very conscious of his image.  And if those are the

16   posts he's making when he knows he's under the spotlight of

17   the government and the Court, those are frankly restrained

18   compared to the posts that he was making before January 6th

19   and I'm afraid the posts we might be able to expect him to

20   make going forward based on his history.

21           The Court highlighted some of the earlier posts

22   the defendant had made, but there are a few others that I

23   wanted to bring to the Court's attention to point out what

24   we might expect to see from this defendant going forward.

25           On January 3, 2021 -- so three days before the

1    6th -- the defendant posted, "Avoid the middle of the crowd.

2    Once you have your bearings and a good location, plan at

3    least a rough escape route.  Be prepared to defend yourself,

4    if needed.  Stun guns are legal, as is pepper spray."

5           I would call that preparations and recruiting

6    others.

7           THE COURT:  So I'm sure I'm going to hear that it

8    was preparation for Antifa, and that this was all defensive

9    in nature, and it was all to protect himself from the

10   concrete jungle of D.C.  How should I receive that argument?

11          MS. PROUT:  Your Honor, I believe the defendant's

12   actions belie that claim.  There was nothing about Antifa

13   that forced the defendant into the Capitol that day.  There

14   was nothing about Antifa that forced the defendant to

15   threaten Officer Craig that day.  It's well and good to have

16   excuses and to put spins on things, but the defendant's

17   conduct doesn't line up with those excuses.

18          I think that line of excuses also doesn't line up

19   with some of the other posts that the defendant made, for

20   instance, on January 6th, the morning of.  So before the

21   event he posted -- or I'm sorry, he -- there's video of him

22   where he says, "To be quite honest with you, I'd like to see

23   some Proud Boys out here with us."

24          Once he left the building, words that he said on

25   camera were, "I took over Nancy Pelosi's office."  That's

1    not about Antifa, Your Honor.

2                He said, "They'd better make a choice, these

3    Capitol Police.  They'd better make a choice.  This isn't

4    about fucking ole misdemeanor.  This is a fucking war.

5    They're trying to take over our country."

6                He said, "You all better pick a fucking side, this

7    is a war."

8                Those are his words.

9                Now, quite frankly, even if he took the actions

10   that he took because he believed there was some threat by

11   some group called Antifa, his actions are extremely

12   dangerous.  We don't live in a land of militias and self-

13   help.

14               So all of this comprises the offenses that the

15   defendant is here to be sentenced for today, the days and

16   weeks of conduct, recruiting others, buying weapons,

17   bringing them to the Capitol, lying about his own role there

18   and what he saw.  And as I mentioned, all of this has an

19   overlay of a lack of acceptance of responsibility and a need

20   for deterrence.  And the need for deterrence is obviously a

21   central consideration for sentencing, and so I wanted to

22   turn to that now.

23               After having sat through this trial for two weeks,

24   listened to the government's witnesses, looked at the video

25   evidence, the defendant continues to say that his actions

1    were nothing worse than a four-year-old's temper tantrum, a

2    silly bluster, or a juvenile joke.  And what all of this

3    says is that the defendant still believes that he can say

4    and do whatever he wants, and if someone else is threatened

5    by it, that's their problem.  And that's why his lawyers

6    made the incredible argument in their post-trial briefs that

7    he and the other rioters didn't disrupt Congress because

8    Speaker Pelosi's staffers could have just locked their doors

9    and kept working.  Good God, if that's where his mind is

10   right now, deterrence is a central consideration.

11           The defendant's trial testimony is further

12   evidence that he thinks that he can say and do anything he

13   wants to without consequences.  The government cataloged

14   statements from the defendant that he made while under oath

15   on the stand, some of which were demonstrably false, many

16   others were so ludicrous that they clearly were false.

17   Claims that, for instance, his stun gun was not functional

18   that day, the stun device that he demonstrated using the

19   night before and then carried with him the entire day.

20           He claimed he had no choice but to enter the

21   Capitol.

22           He claimed that the cap of his stun device fell

23   off.  But that can't be true because the government found

24   video later on where the cap was back on the device.  And as

25   the Court heard, there was no spring attaching the cap to

1    the device.  If he had dropped the cap in the midst of

2    entering the Capitol, there would have been something on the

3    video capturing him picking that cap up and finding it.  So

4    what the video shows is that there were times where the

5    defendant took that cap off, and there were times when he

6    put it back on.

7              And the Court saw those extreme spike electrodes

8    that were exposed when the cap was off.

9              The defendant claimed he took the envelope because

10   it was a biohazard.  Well, he clearly took it because it was

11   a trophy.

12             He claimed that he lost his cell phone or that it

13   must have fallen off a truck, and he put his partner on the

14   stand to say the same thing.  But earlier he had bragged to

15   the FBI about how they wouldn't find anything in his house

16   because he was, quote, a smart man.

17             His willingness to get on the stand and make these

18   statements, some truly preposterous statements, demonstrate

19   a continued lack of respect for the system.  He sat there on

20   the stand, he interrupted the Court while the judge was

21   giving instructions, and after the jury's verdict, he barely

22   stepped outside the courthouse and gave an interview where

23   he and his lawyers said that he did not receive a fair trial

24   because he did not have a jury of his peers.

25             In social media posts, he quipped that he's facing

1    a life sentence for, quote, yelling at cops.

2          And in his filings, he accused seven government

3    witnesses of committing perjury:  three FBI agents, a

4    captain of the Capitol Police, two MPD officers, and one

5    civilian.

6          Frivolous accusations like that are so corrosive

7    to our justice system.  The people who weren't in the

8    courtroom, they don't have the context that we have having

9    listened to those witnesses.  Those accusations are on the

10   public docket.  And the defendant just doesn't worry about

11   those consequences when he makes statements like that.

12         The defendant's absolute absence of remorse and

13   acceptance of responsibility is primarily what led the

14   government to request the high end of the Sentencing

15   Guidelines in this case.  As Your Honor knows, I think the

16   government starts its analysis for sentencing

17   recommendations with the guidelines, and in this case the

18   government does believe that the guidelines are appropriate

19   as far as capturing the extent of the defendant's conduct

20   but not more.  The defendant has no criminal history points

21   even though he has some older DUI offenses.  The government

22   did not seek terrorism enhancement in this case.

23         We believe that the guidelines and the

24   enhancements that have been applied are appropriate in this

25   case.

1          THE COURT:  Okay.  Obviously the guidelines

2    calculation takes into account his decision to go to trial,

3    not to plead guilty, and so he doesn't get the three points

4    for acceptance of responsibility.  And he gets another two-

5    point increase for not telling the truth on the stand as

6    obstruction of justice.

7          So the guidelines do take into account all of the

8    things that you've been citing, yet the government still

9    believes that a top of the guidelines sentence is

10   appropriate here?

11         MS. PROUT:  Respectfully, Your Honor, I think the

12   guidelines take into account some of the things I've talked

13   about, but not all of them.  And obviously we are

14   recommending a sentence within the guidelines.

15         I think what is not taken into account --

16   certainly a defendant is within his right to go to trial.

17   This defendant chose to take the stand and tell lies.  He is

18   getting a two-point enhancement for that.

19         What we've seen, however, is even in cases where a

20   defendant exercises his or her right to go to trial, nothing

21   precludes that person from expressing or exhibiting signs of

22   remorse, signs of acknowledgement of the seriousness of

23   their conduct.  And there's nothing about the lack of

24   acceptance of responsibility and the obstruction enhancement

25   that fully captures what we have here, which is a defendant

1    who continues to believe that all he did was commit a prank.

2         I think a defendant can go to trial and lose those

3    three points yet still understand the gravity of what's

4    before them and still respect the system through which they

5    were tried.  That's something that I respectfully believe is

6    missing here and warrants a high-end sentence.

7         And I would like to turn to the issue of

8    unwarranted sentencing disparities; and the Court has, I

9    believe, rightly focused on the *Robertson* case.

10        Of course no two cases are exactly alike, but we

11   have conducted a lengthy comparison of other January 6th

12   cases, and I'm prepared to discuss some of the cases that

13   the defendant cited as well, but the *Robertson* case really

14   stood out as having some striking similarities to this case.

15        Robertson was a police sergeant.  The defendant

16   here has claimed to be a retired firefighter.  Not the same,

17   but still a first responder position.

18        Robertson, like the defendant, anticipated

19   violence.

20        Robertson packed a gas mask, food rations, and a

21   wooden stick.  The defendant here purchased a stun device,

22   pepper spray, and two-way radios, and brought a steel pole.

23        Robertson stood in crowds that were confronting

24   the police.  The defendant did, too, certainly in the

25   Rotunda.  He also stood in the crowd at the Columbus Doors.

1          Now, sometimes much is made of people who were,

2     say, the first person in at the first breach, but I think

3     what that loses is the perspective that the person who's

4     standing at the Columbus Doors, as the defendant was, may or

5     may not have known who had already breached before him.  For

6     all he knew, he was one of the first people in.

7          Robertson beared his stick at the police, and that

8     was central to the Court's finding on the plus-eight.

9          We've talked already about the defendant's

10    threats, but here the defendant flashed his stun device with

11    the spikes exposed.  And I think we can agree that a stun

12    device is a far more dangerous weapon than a wooden stick.

13    It certainly has the potential to be.

14         Robertson, however, got no further than the Crypt.

15    The defendant here penetrated into the Speaker's office.

16         Robertson left after officers directed him to.

17    The defendant here did not exit after officers directed him

18    to.  He only left after being sprayed with chemical spray.

19         After Robertson left, he posted a picture of

20    himself on Facebook and what said he was, quote, fucking

21    proud of it.  And after the defendant left here, he

22    repeatedly bragged about taking Speaker Pelosi's office, and

23    that was while the riot was ongoing.

24         Robertson, like the defendant, self-surrendered

25    after learning that an arrest warrant had issued, and

1    Robertson, like the defendant, destroyed his cell phone

2    before self-surrendering.

3            Robertson did receive a two-level enhancement for

4    bringing two friends with him and making the travel

5    arrangements.  The defendant did not get that enhancement

6    here even though we know that he did travel with two others,

7    and he did make the hotel reservations.

8            But unlike Robertson's companions, Barnett's

9    companions were smart enough not to follow him inside the

10   building, and he didn't receive -- the government did not

11   seek -- a two-level enhancement for leadership.

12           Now, what Robertson did that the defendant did not

13   do was violate the conditions of his supervision by

14   obtaining firearms.  We don't have that fact here.  But in

15   other ways, the defendant's conduct was worse.

16           As I mentioned, Robertson never got past the

17   Crypt.  The defendant here we know penetrated into the

18   Speaker's offices.

19           Robertson took no trophies; the defendant did.

20           Robertson left after being told to do so; the

21   defendant did not.

22           Robertson brought a stick, and the defendant here

23   brought a much more dangerous weapon to the Capitol.

24           The defendant here also took the stand and

25   repeatedly lied.  As Your Honor has noted, that's reflected

1    in the guidelines.

2              And the defendant here has falsely claimed that

3    the police present at the Capitol were committing murder.

4              The Court sentenced Robertson to 87 months, and

5    that is what the government seeks here, which is a high-end

6    guidelines sentence.

7              The defendant --

8              THE COURT:  Let me just -- since I sat through the

9    trial and I sentenced him and I know what was on my mind, I

10   will tell you that of all of the factors that you just

11   clicked through, you know, I did find that the eight-level

12   enhancement applied, but I found that it overstated the

13   seriousness of his offense because he didn't do anything

14   but, you know, display the stick that he brought.  And so I

15   was prepared to go below the guidelines and vary on that

16   basis, but the reason I didn't, or the primary reason I

17   didn't was you say he committed a release violation.

18             What that violation was was, you know, assembling

19   a small arsenal of automatic weapons in a place where I felt

20   he had access to them and would have been well-prepared to

21   use them if someone came to execute a search warrant at his

22   house or if the next call to arms came in.  And so I had

23   very little confidence that he would not reoffend.

24             And so, you know, if we're going to make that

25   comparison, you know, how does that compare to Mr. Barnett?

1    Should the Court have a similar concern, or not?

2             MS. PROUT:  Your Honor, certainly the defendant

3    did not do what Mr. Robertson did.  He has not violated the

4    terms of his release as far as the government knows.  He has

5    not attempted to obtain firearms while being on pretrial

6    release.

7             However, I do think that the Court should have a

8    similar concern about this defendant's willingness to answer

9    a call to arms.  We have not seen anything to suggest

10   otherwise.  We have not seen a change in perspective.  We

11   have not seen a recognition of remorse, seriousness, or the

12   dangerousness of anything that he did.

13            We have seen a repeated effort to downplay his

14   responsibility, to downplay his own role.

15            And so I do think that there is a remaining

16   ongoing concern about this defendant.

17            THE COURT:  And just to be clear, the sentence in

18   *Robertson* was 87, but that was the low end of his

19   guidelines.

20            MS. PROUT:  That's correct, Your Honor.  That's

21   correct.

22            THE COURT:  Okay.

23            MS. PROUT:  And as I mentioned, there are

24   aggravating factors here that were not present in *Robertson*.

25   I think there is a substantial difference between somebody

1    who leaves the building when they're instructed to and who

2    entered no further than the Crypt compared to somebody who

3    leaves only after being hit in the face with chemical spray

4    and someone who entered the Speaker's office and took a

5    trophy from that office.

6            The defense compares the defendant to Robertson's

7    co-defendant, Fracker, and I know the Court is familiar with

8    that case as well, but in our view, they are nothing alike

9    because --

10           THE COURT:  Well, Mr. Fracker got a 5K1 letter, so

11   they're not alike.

12           MS. PROUT:  Correct, correct.

13           And I can address some of the other cases that the

14   defense raised, if that would be --

15           THE COURT:  That's not necessary.

16           MS. PROUT:  Okay.

17           Well, before I conclude, I did want to relay the

18   comments of two of the victims --

19           THE COURT:  Well, I guess, while you're at it --

20           MS. PROUT:  Yes.

21           THE COURT:  -- I wasn't sure whether I wanted to

22   address this, but they have raised cases involving protests

23   for other reasons, right?  And have suggested that the

24   relevant comparison is not just J6 cases but, you know,

25   Black Lives Matter protests, Confederate monument protests,

1    other potential political protests, I don't know.

2              Why don't you address that issue.

3              MS. PROUT:  Absolutely, Your Honor.

4              THE COURT:  Okay.

5              MS. PROUT:  I think the Court has heard and seen

6    enough about the events of January 6th to recognize that

7    there is no true comparison to the events of that day, both

8    as far as what was going on in Congress politically at that

9    time and the damage and chaos and danger of that day.

10             I think if there were ever a true comparison, that

11   would be something that we should all look at in considering

12   sentencing disparities; but an act of destroying a statue in

13   an isolated event apart from any government proceeding,

14   apart from any threats to officers, does not compare.

15             And likewise with the Black Lives Matter protests,

16   I think I would be reluctant to draw any comparisons without

17   a closer look at the circumstances of what was going on that

18   day in those circumstances and what the danger was.

19             As I mentioned, there are two witnesses or victims

20   who relayed several comments that they asked us to share

21   with the Court today.

22             The first is Emily Berret.  And what she wanted

23   shared was that the invasion of the Speaker's office

24   interrupted the work of the Speaker of the House for far

25   more than one day.  She said that it interrupted their work

1      for over a year, and that those events led to multiple staff

2      members leaving the employ of the Speaker's office.  Some

3      left for other less-high-profile positions within

4      government, and some left public service altogether as a

5      result of those events on January 6th.

6              She also said that those who stayed were

7      psychologically traumatized by what happened.  And

8      specifically she referenced the eight staff members who fled

9      into that conference room and were essentially locked inside

10     there during the events of the riot.  Of those eight, six

11     left public service altogether following the events of

12     January 6th.

13             With regard to Officer Craig, he was also unable

14     to be here today, but he simply wanted the Court to know

15     that what he endured on January 6th was life-changing for

16     him.  He said that the effects of something like that can

17     pile on you.  And he wanted to thank the Court for allowing

18     him to have the opportunity to recount his experience and

19     that he appreciated the case being brought to swift justice.

20             To sum all of this up, as Your Honor knows, you

21     must impose a sentence that is sufficient but not greater

22     than necessary.  This sentence must send a message to the

23     defendant that his actions were terribly serious.  The lives

24     of numerous people, including Officer Craig and Emily

25     Berret, were irreparably harmed.  His invasion of the

1  Speaker's office, his stain on America's democracy that will

2  frankly be featured in the history books, people will be

3  watching what happens, and the Court has an opportunity to

4  send a message of both general and specific deterrence.

5         As I mentioned, we believe there has been no

6  indication that the defendant would not answer the call in

7  exactly the same way that he did on January 6th, and we

8  believe there is no basis to depart from the Sentencing

9  Guidelines.

10         And given all of the factors, we believe that an

11  87-month sentence is fair.  Thank you.

12         THE COURT:  Okay.  Thank you.

13         Why don't we take a brief five-minute break before

14  we hear from Mr. Gross.

15         (Recess taken)

16         THE COURT:  All right.  Mr. Gross.

17         MR. GROSS:  Thank you, Your Honor.

18         I prepared my arguments, but I need to, of course,

19  address a few things that were said by the prosecution.  And

20  I want to open with something that I was not going to speak

21  about today, but I feel like the government opened the door

22  to talk about it.

23         The government almost, I guess, gave an invitation

24  asking -- saying this idea that January 6th, somehow nothing

25  like that has ever happened, a riot like that has never,

1     ever happened in American history.  And I mentioned this in

2     one of my briefs earlier, but with the Court's indulgence, I

3     think it's fair for the purposes of sentencing and to

4     understand the context that I would like to play two minutes

5     of a video just to, I suppose, educate the government in a

6     way to say that this isn't the first time.

7          And it's directly relevant to Mr. Barnett because

8     it involves the circumstances of one of the comparators that

9     I mentioned in the past, who is a man named Matthew Lee

10    Rupert.

11         THE COURT:  This is the gentleman who set fire to

12    the Pike statue?

13         MR. GROSS:  No.  That was Jason Charter.  This is

14    the man who set fire to the -- one of the buildings in

15    Minneapolis and was charged with 231(a)(3).

16         THE COURT:  Briefly.

17         MR. GROSS:  Thank you.  It will be brief.

18         (Pause)

19         (Video playing)

20         MR. GROSS:  We'll work out the video, but I'll

21    read an excerpt from it.

22         THE COURT:  Why don't you describe it.

23         MR. GROSS:  I'll describe it.

24         Excuse me one second, Your Honor.  The Court's

25    indulgence.

1          The description essentially is thousands and

2     thousands of angry protesters watching as a fire moves

3     closer to a police precinct where police are inside the

4     building.  People are climbing up the wall.  People are all

5     over the place.  The reporter is describing it in real time.

6     It was displayed for the entire nation, and the -- once

7     again, the police were -- some police were trapped inside.

8          This was a direct assault on law enforcement

9     saying that law enforcement was not legitimate.  And the CNN

10    brought on a police expert, and they asked the police

11    expert, they said, "Describe to us why aren't the police

12    responding to this fire."

13         So he said, and this is on the record in --

14    I forget which document, but he said the defendant's

15    presence -- that's not it.

16         They said, "Police had made a calculated decision

17    that they are not going to enforce what we are seeing behind

18    us.  There is fire being set to the police department as you

19    can hear what's going on behind us.  There are fireworks

20    going off, people climbing up the side of the building."

21         I'll pause here to note that in addition there

22    were people cheering as the fire was going.

23         "They" -- the police department, and the fire

24    department -- "made the calculated decision that they are

25    not going to stop people from doing that.  I think the

1    reason is that they know that any type of police presence

2    here is going to be met with aggression and agitation by

3    this crowd that is clearly unhappy.  We were just three

4    blocks away at a financial institution that was on fire.

5    The fire department was there, but they were keeping a

6    distance.  They were not moving in to fight this fire, not

7    wanting to put themselves in jeopardy or danger from this

8    crowd that was clearly agitated.  They're going to let the

9    building burn.  They know the decision right now is you lose

10   a building or you lose lives potentially."

11             And what -- the reason I bring this only is when

12   we're talking about the idea of January 6th being unique.

13             So the government accused the defendant in one of

14   its briefs in saying that January 6th was unique in the way

15   that the government has pursued people who were related to

16   January 6th.

17             Now, that doesn't mean it's the only reason that

18   it's unique, but the government also said that we've heard

19   so much about what went on on January 6th.  Of course we

20   have, because there have been a thousand cases already, and

21   there are a thousand more.  There were not a thousand cases

22   when thousands of people burned down a police station, which

23   is impossible to construe outside of violating 18 USC

24   231(a)(3), which is impeding an officer --

25             THE COURT:  Any nexus to that particular --

```
 1                    MR. GROSS:  Any what?

 2                    THE COURT:  Any federal nexus to that local police

 3       station?

 4                    MR. GROSS:  I don't believe that 18 USC 231(a)(3)

 5       requires there to be a federal nexus.  I think that the

 6       crime --

 7                    THE COURT:  Lots of folks have been prosecuted in

 8       state court for protests from that summer, right?  Do you

 9       agree?

10                    MR. GROSS:  Were they charged with 231(a)(3)?

11                    THE COURT:  I don't know what they were charged

12       with.  But would you agree that lots of folks have been

13       charged in connection with those protests?

14                    MR. GROSS:  That I don't know.  I know that --

15       because I've only seen the federal statistics.

16                    THE COURT:  Okay.  How many folks charged

17       federally?

18                    MR. GROSS:  Federally there, only one was charged

19       with 18 USC 231(a)(3).

20                    THE COURT:  Across the country, only one?

21                    MR. GROSS:  Only one in that incident where there

22       were thousands of people who were committing that very

23       offense, and that's scary.

24                    And I want to point out that in Kenosha,

25       Wisconsin, only one man named -- I believe his name was
```

1    Ashton Howard, he threw a brick at a police officer during a

2    civil disorder.  He was charged with 231(a)(3), and he was

3    sentenced federally to five years, which is less than what

4    the government wants to give Mr. Barnett.  Ashton Kutcher --

5    Ashton Howard, I would say, he hit a police officer and

6    knocked him unconscious.  He was the only one charged, I

7    believe, in the Kenosha riots with 18 USC 231(a)(3).

8            So the reason I bring this up and the reason I say

9    the government opened the door to this is that the

10   defendant's brief did say that January 6th is unique in the

11   way that the government has pursued the people who were in

12   any way related to the Capitol on that day in a way that

13   they have not in other ways because then you would have seen

14   thousands of federal cases across the country for all the

15   rioters like that.  I'm sure there were people who yelled at

16   police officers in a way that Richard Barnett did, or worse,

17   in Wisconsin, in Minneapolis, in Atlanta, in Dallas, in

18   Washington, D.C.

19           And you mentioned Jason Charter earlier.  Yes,

20   Jason Charter pulled down a statue.  He was part of pulling

21   it down.  He was on restricted grounds near the White House,

22   just like they were charged with.  And the president I

23   believe at the time was in a bunker.  And he got in the

24   middle of the crowd -- he was clearly the ringleader, if you

25   watch the videos -- he told everybody, "Get back."  He took

1    out some kind of flammable liquid, which I would say is a

2    deadly weapon with certainly -- because he also had matches,

3    and he the lit the thing on fire, and it blew up.

4              And he was arrested.  He was not, like Mr. Barnett

5    was, held for four months pretrial.  He was arrested twice

6    for attending political protests and assaulting police

7    officers before his trial.  Twice.  Not once.  On two

8    different occasions.  And he's a known Antifa member, and he

9    was given probation.

10             THE COURT:  Counsel, address this case, okay?

11             MR. GROSS:  Okay.  So I will address this case.  I

12   just want to mention that when they talk about the

13   uniqueness of January 6th, I think that the government --

14   that the Court respectfully needs to take what the

15   government's saying with a grain of salt and understand the

16   broader context.

17             And the last thing I want to say before I get to

18   my own statement in addressing Mr. Barnett is that -- I

19   think we heard it, Your Honor, that Mr. Barnett is here

20   because of the picture, and the timeline shows that.

21             Mr. Barnett, when he was driving back to Arkansas,

22   was already designated by Loel Skoch, the FBI agent who

23   testified here; he was designated as a Tier 1 domestic

24   terrorist.  When that happened and you read the report, they

25   didn't know anything about the Hike 'N Strike.  They learned

1   about that I think a week later because a tipster pointed it

2   out, not because Officer Craig said anything or anybody

3   else.

4          At that point he had already been in contact

5   through his family with local law enforcement and had agreed

6   that he would go to the police station the next -- as soon

7   as he got home, which he did.

8          Officer Craig was -- nobody knew about Officer

9   Craig.  Officer Craig did not have an interview with the FBI

10  until years later.  It was a year and a half later.  Until

11  October of 2022.  And that's why the indictment for the 18

12  USC 231(a)(3) only came about days before the trial.  They

13  didn't know about the incident with Officer Craig.  I think

14  that the evidence shows that the government was mad because

15  Richard Barnett was sitting at a desk that he shouldn't have

16  sat at, which he did, and there's a picture of that.

17         But that's why we're here, I think.  I think the

18  Court suspects that based on the questionings.  I hope the

19  Court suspects that, and that's why we think that them

20  asking for seven years is disproportionate.

21         And I should note one more thing in relation to

22  that is that he was not offered a plea deal.  Before they

23  knew about Officer Craig and that incident, he was offered a

24  plea deal that was 87 months, so -- which he rejected

25  because he had no choice.  He felt that he was being treated

1    unfairly, which is still his position.  And that, I think,

2    also suggests that when they talk about Officer Craig and

3    all the things that happened in the Rotunda during those two

4    minutes from 2:58 to 3:00, they -- they're disingenuous to

5    say that that's the reason that they want the -- and they

6    don't.  They really don't say that.  They actually do say

7    that the reason that they want this is because he's a

8    symbol, and he should be punished for that.

9           So that's in terms of responding to the

10   government.

11          I'm just looking at my notes about anything else

12   that was made, just little incidental things.

13          We object to the fact that Emily Berret is a

14   victim of this.  She testified that nothing was stolen from

15   her.  The fact that he sat in her chair I think hardly

16   qualifies her as a victim.  So the fact that calling her

17   "victim" I think is also disingenuous.

18          And the last thing I want to say -- oh, actually I

19   want to address -- I want to address the phone, which I

20   didn't plan to address, but I will.

21          There's a big difference between Robertson and

22   Barnett regarding the phone.  The jury was presented the

23   question about Robertson's phone.  The government did not

24   present that to the jury.  He was not charged with that.

25   And the reason he was not charged with that was because

1    there was no evidence that what he said was not true in that

2    he -- he would have liked to have his phone.  He recorded

3    himself the whole morning shaking hands with police

4    officers.  That would have been great.  There was nothing

5    that could have been incriminating on that phone.  The

6    government doesn't suggest that there was anything

7    incriminating on that phone.

8              He Tweeted or posted on Facebook lots of videos

9    from that phone.  It doesn't look like -- from his videos

10   when he's shouting at the hotel, you know, "Hello,

11   Washington, D.C.," or whatever he was shouting, it doesn't

12   look like he was holding back.  The government doesn't

13   insinuate that there were other people that he was

14   coordinating with.

15             THE COURT:  Why did he tell the FBI that "You

16   won't find my phone because I'm a smart man"?

17             MR. GROSS:  First, I have not seen that video, but

18   I will say, Your Honor --

19             THE COURT:  We saw it at trial, didn't we?

20             MR. GROSS:  I will say that the defendant, when

21   he was at that interview, he had not slept in 72 hours.  He

22   had -- if you watch the whole video, which I've been told,

23   is that he says -- many times he mentions a lawyer, but he

24   had not spoken with a lawyer.  His wife was, you know,

25   crying in the next room.

1              There were a lot of extenuating circumstances in

2       terms of the things he said.  It's hard to understand from

3       that -- and I'll just say that.

4              THE U.S. MARSHAL:  (To the defendant) Sir, sit

5       down.  Don't do that again.

6              MR. GROSS:  Sorry, sorry.  I apologize.

7              According to the defendant, he said "You won't

8       find anything."  He did not mention his phone.  And -- but I

9       want to say in terms of changing stories and perjury, and

10      I'll just address this one time, and this is that the

11      government brought Officer Jonathan Willett, who was also at

12      that interview, and Jonathan Willett was asked if he could

13      take a selfie with Mr. Barnett, and on the stand under oath

14      he said emphatically no.

15             And then the next day he somehow didn't recall.

16             And in the government's recent motion you said

17      that -- regarding these discrepancies you said that there's

18      sometimes lapses in memory.  So anything that they want to

19      say happened at that interview, whatever it was, it was not

20      perjury.

21             And I have nothing else to say on that other than

22      we would have liked to have that phone.  He lost the phone.

23      He was under a lot of stress at that time.  And there was

24      nothing that the government said was on that phone.

25             It's not like he was accused of being part of some

```
1    militia or something, that he was coordinating with people.
2    There was no motive for him to --
3              THE COURT:  Well, we just don't know, do we,
4    Counsel?
5              MR. GROSS:  What?
6              THE COURT:  We just don't know, do we, Counsel?
7    Because there's no phone.  Right?
8              MR. GROSS:  I mean -- yes.
9              THE COURT:  Okay.
10             MR. GROSS:  Thank you, Your Honor.
11             In other things, I want to address something that
12   she said about -- she mentioned the Proud Boys, so I think
13   it has to be mentioned.
14             The exhibit that she was referring to, if you
15   watch it, he actually says specifically that he's not
16   related to the Proud Boys, and he says -- his understanding
17   at the time is that this was a group that fights Antifa or
18   whatever, but he was not related to them.
19             He said, "I don't see any of them here."
20             But then he says, "I'm happy that I don't see
21   Antifa here."
22             He did not want to fight Antifa.  He wanted not to
23   fight Antifa.  He wanted to protect people in case Antifa
24   showed up.  That was his concern.
25             I put in the sentencing memo incidences in
```

1    Washington, D.C., where Antifa or other radicals attacked

2    right-wing protests.  It's not unprecedented.  It's what he

3    saw for two years, and he wanted to legally protect himself

4    in case that happened, and that's why he brought a Hike 'N

5    Strike.

6         It is legal to carry them in Washington, D.C.  He

7    did not anticipate that he would be inside the Capitol that

8    day.  There's no evidence that he did, and the fact that he

9    brought a Hike 'N Strike to Washington, D.C., is not

10   evidence of anything.

11        And then the last thing I guess I want to say in

12   reference to what they said is that the government makes a

13   big deal about the stuff that Mr. Barnett says.  I just --

14   the government really -- it's almost chilling when you hear

15   the government say these things.

16        When you're talking about the *Robertson* trial,

17   what the Court found was that he amassed an arsenal of

18   weapons while he was on release, and that's -- and the

19   government found that:  Uh-oh, this guy could potentially do

20   something like January 6th again.  That was the Court's

21   finding in that case.

22        What the government is doing is that they're

23   comparing his social media posts to that.  And I just want

24   to say that that's chilling, and I hope that the Court does

25   not consider that as evidence of anything.  I would think in

1    America -- what we would hope -- is that people, when they

2    disagree, they air their disagreements honestly on social

3    media and verbally rather than amass arsenals of weapons.

4            So with that, I want to address some of the issues

5    with the Court's permission, and I'll be quick.

6            So we're not here to retry the facts of the case.

7    I'm going to limit the presentation just to three sections.

8            Number one is Mr. Barnett's conduct briefly on

9    January 6th and leading up to it.

10           Number two, comparison with other cases.

11           And number three, the need for appropriate

12   deterrence.

13           So regarding his conduct, first of all, I think

14   that the government failed to establish that there was

15   planning of any kind for an insurrection or otherwise by

16   Mr. Barnett based on his statements and social media posts

17   prior to January 6th.

18           The government brings, as his pre-January 6th

19   comments -- this is the worst that the government can find

20   after scouring his very voluminous social media posts --

21   quote, I ain't going down easy, period, end quote.

22           Another one, quote, I'll do whatever it takes, end

23   quote.

24           Those two quotes were taken from Government

25   Exhibit, I want to say -- I don't have the number, but where

1    it was a news report on a peaceful protest in Arkansas on

2    November 14, 2020.

3            So the government is saying that Mr. Barnett was

4    advocating for violence at a peaceful protest in Arkansas

5    days after the election, and the government cut him off --

6    not the government, the news reporter cut him off.  What he

7    said was, "I'm not going down easy.  I'll do whatever it

8    takes, even run for governor."  And he was announcing

9    hopefully -- he hoped to announce on the news his run for

10   governor of Arkansas, and the news reporter cut him off, and

11   just said, "I'll do whatever it takes."

12           But even by itself, "I'll do whatever it takes" is

13   not any indication of violence.

14           THE COURT:  I'm sorry.  Mr. Barnett was planning

15   to run for governor of Arkansas?

16           MR. GROSS:  Yes, he was.  I mean, he wanted to

17   announce his run.  That can be confirmed by multiple people.

18           Number two, he said, "I came" -- he posted, I

19   should say, "I came into this world kicking and screaming

20   covered in someone else's blood.  I'm not afraid to go out

21   the same way."

22           That quote is, first of all, from a science

23   fiction novel.  I Googled it.  It is a quote that

24   essentially says figuratively that Mr. Barnett, saying about

25   himself, is very brave.  It is not a threat to anyone.  It's

1    certainly not a specific threat to anyone.  And it's

2    definitely not a threat to he is going to travel to

3    Washington, D.C., and take over the government or break into

4    the Capitol or, you know, murder Nancy Pelosi or anything of

5    that nature.

6              It is a quote.  It's on social media.  That is

7    what it was.  He was speaking to it.  It was not said in the

8    context of -- it was posted on December 18, 2020.  It was

9    not said in the context of going to Washington, D.C.  It's

10   something he wrote.  It's not a specific threat.

11             But that is the worst, because it mentions "blood"

12   in it, but it is not anything near what this Court has seen

13   in other cases.

14             And finally, the last quote I want to say is --

15   the quote is, "Anyone, and I mean anyone, that does not

16   support the Constitution of the United States of America is

17   my enemy and will be treated as such, civilian, law

18   enforcement, or military."

19             That quote also was not said in any specific

20   context.  That quote is essentially taken from the Army's --

21   the United States Army's values, which is almost line for

22   line the same thing.  It says that he supports the

23   Constitution, and people who don't are his enemy.  It

24   doesn't say, as the government implied, that he will fight

25   them.

1          And the government in its sentencing memo very

2     misleadingly actually didn't quote it.  It said -- they

3     wrote, "Anyone who opposes me is my enemy, and I'll fight

4     against them," or something to those -- to that effect, and

5     they put it in the context of these calls to violence.

6          That was the best the government can do in terms

7     of his social media posts.  They bring other stuff that he

8     said on camera when he was in D.C. like "We didn't come here

9     to sing Kumbaya."  It was political rhetoric, all of it.

10    None of it is what we've seen.

11         And we'll see, when I get to the comparisons, some

12    of the posts that they found from other January 6th

13    defendants, including Robertson, that were very clear and

14    very specific, and Mr. Barnett's were not that.

15         In terms of his coming out of the -- in terms of

16    coming out of the Capitol and celebrating -- the Court's

17    indulgence.

18         (Pause)

19         MR. GROSS:  In terms of his celebrations outside

20    of the Capitol after the incident in the Rotunda, once again

21    whatever he said, he said, and it doesn't indicate -- first

22    of all, it's after the fact.  He was very excited at the

23    time.  And most of the statements that he said were to the

24    effect of "I didn't steal this envelope.  I was pushed in."

25         And they cite one -- the government quoted one

1    thing from one of the exhibits -- and I forget which

2    exhibit, I don't know it offhand -- where he was talking

3    to police officers when he came out.  I believe -- I want

4    to say it's 209, Government Exhibit 209, but I'm not sure,

5    but -- thereabouts, maybe 208.  And he said that -- he said

6    to the -- they quoted it.  And they said, "Oh, he was

7    talking violence," or something.

8            He said at that time -- when he left the building,

9    he goes right up to Capitol Police, he said, "You boys maced

10   me.  You maced American citizens."  He said that.  He was

11   mad at them.  And then he said, "We're going home now.  It's

12   not going to be today.  We're going home now."

13           And that's what he did.  He went in his car and

14   went home.  He didn't go back.

15           Many people, as we'll see, they left the Rotunda

16   as Mr. Barnett was -- they refused to leave the Rotunda.

17   When they were pushed out of the Rotunda, they went over to

18   the west side and were still at the Capitol for another hour

19   or more involved in further activity.

20           So I'm going to close with this and just say that

21   I think that the government failed.  I think that they did

22   not -- we don't have some smoking gun social media post that

23   says, "Hey guys, let's go to the Capitol and take over the

24   government."  He didn't say that.  I think that the lack of

25   evidence is the strongest proof of that.

1          So with that, I'll move on to his conduct.  And

2     once again, I'll be quick.

3          First when he entered the building.  Many January

4     6th defendants are caught on camera enthusiastically

5     entering the building and encouraging others to do the same.

6     Mr. Barnett is caught on camera shouting, "We have no

7     choice."

8          Now, the Court has seen the evidence, and I assume

9     that the Court has made up its mind.  I wrote in my

10     sentencing memo that the government's position is that this

11     was some kind of ingenious plot that nobody else at the

12     Capitol thought of; that he's going to create

13     contemporaneous video evidence of himself because he knew

14     exactly what was going to follow from January 6th.

15          It's a very unlikely theory.  I think that it is

16     the preponderance of the evidence that Mr. Barnett was

17     pushed into the Capitol against his will.

18          Further, I just want to add that Mr. Barnett --

19     there was no way for him to even know that those doors were

20     open.

21          And with that I will refer the Court to the Judge

22     Kavanaugh swearing in.  Not the confirmation hearing, which

23     was obstructed, but the swearing in.

24          While he was being sweared in by John Roberts --

25     and you could watch the video -- the protesters ran up the

1   steps to the Supreme Court.  It looks exactly like the

2   Columbus Doors.  It's almost identical.  And they're

3   pounding on the doors, and the police are there, and they're

4   pounding past the police.

5          And they're saying things like, "Let us in," and

6   "Hey, ho, ho, Kavanaugh's gotta go"; making all kinds of

7   statements that certainly, if this was January 6th, would

8   have been perceived as threats, and their lawyers would have

9   had to kind of defend them and say, "No, not exactly."

10         But had those doors opened, those people would

11   have rushed right in.  That's exactly what would have

12   happened.  Some of them pushing others against their will.

13   Mr. Bar -- you've watched those videos.  It's strikingly

14   comparable.  Those people got $50 fines.

15         Mr. Barnett was on those steps for whatever

16   reason, and he shouldn't be treated differently for that

17   conduct than the people who were there when one of the

18   Supreme Court justices was about to be sworn in for a

19   lifetime position, and they didn't like the result of that,

20   and they were pounding on the door while he was being sworn

21   in and trying to interrupt that.

22         Second, in Nancy Pelosi's office, the government

23   thinks that what he did was vulgar.  They write that in

24   their sentencing memo.  That's the word they use.  But

25   others did exactly the same thing and worse and were given

1    days, and some were not even arrested.

2           There is evidence that there was a girl --

3    there's a picture of her.  She's sitting at a desk right

4    next to Mr. Barnett.  She put her feet up.  She stole

5    something far more valuable than Mr. Barnett.  She was

6    interviewed by the FBI.  She was not arrested.  And the

7    government's aware of that obviously.  And she wrote a note

8    to Nancy Pelosi also.  Strikingly similar.

9           What Mr. Barnett did was he wrote a note.  It's

10   not a threatening note:  "I will kill you, Nancy."  He did

11   not write that.  He wrote:  "Hey Nancy, Bigo was here."  And

12   then he called her a dirty word.  That's what I said in my

13   memo when I wrote that; that, yes, he views that as a

14   juvenile joke, and he regrets that.

15          Third, leaving the office.  And for this --

16   there's a connection problem, so I will direct the Court to

17   Government Exhibit 101, and I will just describe it.  It was

18   only one minute of video that I wanted to show.

19          So to set the scene -- to set the scene, the --

20   there are no Capitol Police officers in the Rotunda.  The

21   Capitol Police officers at about 2:00 kind of make their

22   way in by bicycle and otherwise to the Capitol and arrive at

23   the west.  And there's a lot of stuff going on at the west.

24   Mr. Barnett was not a part of that.  And the Capitol Police,

25   including Officer Craig; and including Officer Quenterra

1  Carey, who testified; and including Officer Morgan Smiley,

2  who testified; those three officers, with lots of other

3  officers, including Officer Kevin Danko, they all went into

4  the building through the west, and they went straight up a

5  staircase.  There's about maybe 10 or 20 feet -- I'm not

6  sure -- between the staircase and this door to the Rotunda.

7          They get to the Rotunda, and they see people

8  peacefully coming in from the east.  In fact, Officer Craig,

9  he arrives at the door.  We watched his entire body camera

10  footage.  And he sees some old people; they're sitting

11  there.  He tells them they can stay.

12          Another person says, "Where's the bathroom?"

13          They say, "We don't know."

14          The officers are instructed not to do anything.

15  They're instructed to just stand down and hold the wall

16  because they're afraid that people will go through and join

17  from the back in the west.

18          When the officers start to gather there, Officers

19  Quenterra Carey and Officer Morgan Smiley, two female

20  officers, are instructed or on their own go to sweep the

21  offices.  Nobody has been in the offices at that point from

22  MPD.  And they get there.  They go to this terrace.  They

23  see a bunch of all nonviolent peaceful protesters.  They

24  tell them, "Leave."

25          Everybody leaves.

1    They do not instruct them where to go.  They just

2    say, "Get out.  You gotta get out of here."

3    So those people start going out, and then they

4    start making their way down the hall towards the door of the

5    office that Mr. Barnett happened to be in at that time.  And

6    if you watch the video, on that video at exactly two minutes

7    and I want to say 15 seconds, or wherever it is on

8    Exhibit 101, you can see that first officer, Morgan Smiley,

9    who is wearing a yellow jacket, she is approaching the door

10   and actually approaches the door.

11   A number of protesters, two or three protesters,

12   are coming out on their own, and one of them is Richard

13   Barnett.  He's coming out on his own before he was

14   instructed.  He was leaving the office.  He saw others leave

15   whatever it was, and he was leaving on his own.  Nobody had

16   to tell him.

17   He walks past Officer Smiley.  He turns around, he

18   mouths off to her.  No threats.  He calls her -- he doesn't

19   even call her.  He says, "You have to give up Communism," or

20   something of that nature.  Whatever he said, it was not a

21   threat.  It was not perceived as one because she doesn't

22   scream; she doesn't run to get reinforcements; she doesn't

23   run away.

24   He doesn't say, you know, "I'm going to get you,"

25   or "Get out of my way."  And he says -- I think he says to

1     her, "Be a patriot."  He's probably about to say, as we see

2     earlier, "Be a patriot and get my flag."  But he's on his

3     way out.

4             She then goes back -- she's not paying attention

5     to him, and turns around and goes back towards the balcony.

6             Mr. Barnett turns to walk towards the Rotunda, and

7     then apparently he says, "You know what, I'll just go back

8     and get my flag."  It's not going to be a big deal in his

9     head.  He doesn't say that, but I'm saying.

10             What appears to happen is --

11             THE COURT:  Mr. Gross, if you could slow down just

12     a little bit for the court reporter.

13             MR. GROSS:  Sorry.

14             He appears to be walking back.  He walks back into

15     the office.

16             And then Officer Carey, who is watching from the

17     side the whole time, comes forward and says -- there's no

18     sound in the video, but we have her body camera, and she

19     says something, "Hey you, get out."

20             He turns on a dime and starts walking towards the

21     Rotunda.

22             And then he mouths off to her.  But as he's

23     backing away, videoing it, and then he walks right into the

24     Rotunda, and that's it.

25             And he was not accused of 18 USC 231(a)(3) for

1    impeding those officers.  He really listened to their

2    directions, and that's the end of that.

3            Moving on to Officer Craig.  So he enters the

4    Rotunda at, I believe, 2:57:01.  And then he says to the

5    first officer, "I need my flag."  He says to the second

6    officer, "I need my flag."  He says to the third one, "I

7    need my flag."  He says that.  He says that a bunch of

8    times.

9            He finally ends up at Officer Craig, which, to his

10   credit, was -- Officer Craig was at the extreme end, and

11   Officer Craig was not the one who was being confronted by

12   protesters.  He was actually the most accessible MPD officer

13   at the time.  And he -- first, as you write, I think, at one

14   point, he bargained with Mr. Craig for a while, with Officer

15   Craig, and then eventually he said things -- the Court

16   counts 15 threats.  Our count is different.  But he

17   certainly says words that -- it's not easy for Mr. Barnett

18   to watch that video in terms of the words that -- you know,

19   his -- during that one minute.  It's really about 20 seconds

20   where he said things to Officer Craig.

21           But during that time, at no time did he say, "I'm

22   going to hurt you.  I want to hurt you.  I will kill you.  I

23   will" -- anything of that nature.  And he certainly didn't

24   say, "Get out of my way" or "Get me my flag or I'll get you

25   with my Hike 'N Strike."  And he certainly didn't pull out

1    the Hike 'N Strike.

2          The only two things that the government has --

3    their whole case really hangs on the four-second wave of his

4    hand and the two-second period where his sweater went up.

5    And for two seconds, less than two seconds on the video, you

6    can see the handle of the Hike 'N Strike that is tied to his

7    waist, that is attached to his belt.

8          Starting with the wave -- and you address this in

9    your most recent order.  It's at best ambiguous.

10         Mr. Barnett is holding a camera.  Everybody there

11   is holding cameras.  There's a man who passes by in the back

12   who seems to have a big camera.

13         At the time of the wave, there was a few feet away

14   from Officer Craig and Richard -- and Mr. Barnett, there was

15   a female officer.  It was actually Officer Marina Bronstein

16   was her name.  And she gets into a fight with the woman in

17   the red sweater and a red hat.  And it's not clear who

18   started it, but it is clear that Marina Bronstein punched

19   the lady in the face.  And the crowd goes wild.

20         And at that point Mr. Barnett takes his camera and

21   points it towards there, and everybody seems to point their

22   camera.  And Mr. Barnett sees a man with a big camera and

23   goes like this (indicating), and you see the man with the

24   big camera come.  That's what Mr. Barnett says he was doing.

25         Now, obviously he's only able to see that from the

1    video.  You know, I don't think anybody has a point-by-

2    point, second-by-second recollection of exactly what

3    happened that day.  But that's definitely a plausible

4    explanation of what you see in the video.

5          The government says that no, he was saying

6    "Everybody come on in.  Let's go and rush the gate so I can

7    get my flag."

8          Those are the two -- it's four seconds of

9    ambiguous footage where he waves his hand like this, and the

10   government wants to really hang the entire incident on that,

11   and the two seconds where his -- the handle shows.

12         When it comes to the handle, it's very clear from

13   the video, number one, he never says anything about the Hike

14   'N Strike.  He never -- when he's confronted by Officer

15   Carey, he doesn't go for the Hike 'N Strike.  When he's

16   presented with Officer Smiley, he doesn't present the Hike

17   'N Strike.  Later, when he's in the Rotunda and he's asked

18   to leave and he leaves immediately, he doesn't come out with

19   the Hike 'N Strike.  He doesn't say, "I'm going to get you

20   with my Hike 'N Strike," as I've said.

21         At that moment that the government wants to say he

22   was brandishing the Hike 'N Strike, he is pushed at the same

23   time by three hands, two hands and one body.  From the front

24   Officer Craig pushes him.

25         And I should note that when Officer Craig says,

1   "Oh, he was getting into my personal space," if you watch

2   the video, not Officer Craig's particularly, but the officer

3   who stood next to him -- I forgot his name.  I believe it's

4   Exhibit 203.

5          But Officer Craig, you can see at one point,

6   can't hear Mr. Barnett, so he goes like this (indicating).

7   And Mr. Barnett actually leans in to like whisper in Officer

8   Craig's ear, because Officer Craig is wearing a gas mask and

9   he's a head taller than Mr. Barnett, and they're in the

10  Rotunda that has an echo, and there are lots of people

11  shouting.

12         So Mr. Barnett is getting closer to Officer Craig,

13  so Officer Craig pushes him back.  And at the same time

14  Officer, I think it's Kevin Danko, pushes him back, and you

15  can see two different colored gloves pushing him back.  And

16  from behind him there's a lady who is screaming and yelling

17  who is pushing over Mr. Barnett that Mr. Barnett seems to be

18  oblivious of because he's concentrating on his flag as he's

19  going forward into these two hands.

20         At that moment his sweater went up, and he's

21  holding his camera with his right hand, and he goes like

22  this with his left hand (indicating).  He puts it on the

23  Hike 'N Strike.  He kind of adjusts uncomfortably, and then

24  he pulls his sweater down.  And that's the only time you

25  ever see the Hike 'N Strike.

```
 1              And then he says, right after that, like a second
 2      later, "Okay, I'm going to wait over here on the side while
 3      someone gets my flag."  He moves to the side, and he checks
 4      his phone.  And because I don't have the video, with the
 5      Court's permission, I would like to be able to supplement
 6      and put a montage of this together.  We can discuss this --
 7              THE COURT:  Too late for that, Counsel.
 8              MR. GROSS:  Too late for that.
 9              So anyway, he says, you know, "Okay, I'll check my
10      phone."
11              He checks his phone.  He goes to the side.
12              Then Officer Craig turns around and talks to
13      another officer, and for the first time that officer says,
14      "We have to get all these people out of here," talking about
15      the Rotunda because the Rotunda is filling up.
16              That happens -- this is all in my sentencing memo.
17      You can check --
18              THE COURT:  Counsel, I've read the sentencing
19      memo.
20              MR. GROSS:  Okay.
21              THE COURT:  I've watched the videos.
22              MR. GROSS:  Exactly, exactly.
23              THE COURT:  The jury also saw these videos, right?
24              MR. GROSS:  Agreed.  And I'm saying this for the
25      record.
```

1            THE COURT:  Okay.

2            MR. GROSS:  And the point is is that Officer Craig

3    turns around; he talks to another officer.  Mr. Barnett goes

4    to the side, and then things got out of hand.  Mace is

5    sprayed.  Mr. Barnett is sitting on a pedestal, and they

6    say, "Would you like to leave?"

7            And he says, "Yes."

8            He leaves.  Others stay.  And there is an

9    altercation in the Rotunda.

10           All of that said, nothing happened in the office

11   that was violent.  Nothing happened with Officer Carey and

12   Officer Smiley in the office.  Nothing happened with Officer

13   Craig other than the wave, the sweater going up, and the 15

14   statements that he said.  And that's the entire altercation

15   with Officer Craig.

16           I should also note for the record that the jury --

17   we do not know what the jury thought about the conduct

18   because he could have been convicted of 18 USC 1512(c)(2)

19   simply for being in the Capitol, as many people were, and

20   that doesn't tell us what the jury thought about his

21   encounter with Officer Craig.  He could have been convicted

22   for 18 USC 231(a)(3) simply for yelling at Mr. Craig and

23   getting too close to him so that Mr. Craig couldn't do other

24   things at the same time.

25           So the jury doesn't tell us anything about the

1    extent of Mr. Barnett's activity on that day.

2              So that's as far as that is concerned.

3              So just to repeat:  the words, the wave, and the

4    sweater.  All together it adds up to 30 seconds of conduct.

5    The government wants to say that we are downplaying the

6    enormity of January 6th by focusing on the 30 seconds of

7    conduct, but that's the government's doing.

8              The government told us I think on January 4th at a

9    status conference, days before trial, that he was

10   essentially being accused of this 231(a)(3), which they

11   superseded right before Christmas because of the interaction

12   with Officer Craig.  So that's why we're nitpicking these 30

13   seconds of conduct, because they need these 30 seconds of

14   conduct because they know that they can't just say we want

15   him to have seven years because there was a picture of him

16   in Nancy Pelosi's staffer's desk.

17             So we're not downplaying the enormity of January

18   6th.  January 6th was a traumatic day for everyone.  But we

19   are forced to nitpick the conduct in front of Officer Craig

20   because that is an allegation against Mr. Barnett, and we

21   hope that the Court sees those 30 seconds of conduct for

22   what it was.  No one was hurt because of it.

23             THE COURT:  I get the point.

24             MR. GROSS:  Exactly.

25             THE COURT:  Move to your next one.

1          MR. GROSS:  Next.  Moving on.

2          Thank you, Your Honor.

3          Next.  Comparisons.  The government wants to

4    compare Mr. Barnett to Thomas Robertson, but it is a

5    terrible comparison.  Before January 6th, Robertson wrote,

6    quote, I've spent most of my adult life fighting counter-

7    insurgencies.  I'm about to become part of one.

8          That is obviously very different from anything

9    Mr. Barnett said.  And I'm not going to get into that any

10   more because I think I've covered that.

11         But next, very significantly, as the Court noted,

12   that Mr. Robertson was trafficking in guns.  Mr. Barnett was

13   perfect, A-plus, 100 percent since he's been released.  This

14   Court knows that Mr. Barnett is not a threat.  He was one of

15   the few January 6th defendants permitted to stay in

16   Washington, D.C., during his trial.  During that time when

17   he was here at the hotel, he would share the buffet in the

18   morning with MPD officers and was cordial.  Mr. Barnett is

19   not a threat to anyone.

20         In *Robertson*, the main thing that the Court wanted

21   to talk about with the deadly weapon was his use of the

22   stick, which was completely different than Mr. Barnett's use

23   of the stick.  The government wants to say that a Hike 'N

24   Strike is like substantially more dangerous than a stick,

25   and I will disagree with that.  In that situation, the best

1    that Mr. Barnett could have done maybe was -- I don't even

2    want to suggest what he could have done with it.  It was

3    tied to his -- it was tied to his belt.

4             A stick in your hand is different than a Hike 'N

5    Strike tied to your belt.  Whatever the capabilities of the

6    Hike 'N Strike were, it's not relevant because he wasn't

7    holding it.

8             Robertson was holding the stick.  And the Court, I

9    know, analyzed very carefully what manner the stick was

10   conveyed.  Was it a threat, or was it defensive?  I'm going

11   to quote from the *Robertson* transcript.

12            "Was he holding it" --

13            THE COURT:  So I know what I said.

14            MR. GROSS:  Okay.  Then I won't quote it.

15            The point is Barnett was not even holding it.  He

16   never used it.  He never mentioned it.  When he was asked to

17   leave, he left.

18            Next, other obvious differences between Robertson

19   and Barnett.

20            Robertson donned a gas mask.  Whatever Mr. Barnett

21   came with, he came with a flag to a rally, and it was tied

22   to a pole.  Flags are tied to poles.  It was a very heavy

23   flag.  There was an exhibit that shows how heavy the flag

24   was.

25            THE COURT:  Ten-pound metal poles?

1          MR. GROSS:  It was a very, very heavy flag, and he

2     explains that in the video.  It's actually -- it's very

3     convenient that he has that video.  If you watch the

4     exhibit, he talks about how the flag is very heavy.  He

5     shows it's big, leather.  It's not like one of these flags

6     that's in the courtroom that's made of fabric.  It was

7     hanging on his wall.  And he says, "This has good balance to

8     it.  It's going to be windy.  It's going to be cold."

9     That's what he said.

10          You can see actually -- they always talk about how

11     he doesn't use the Hike 'N Strike as a walking stick.  He

12     actually uses the flag a lot as a walking stick.  The flag

13     was pretty helpful.

14          The fact that he said it was a ten-pound pole, I

15     mean, that's what he said it was because I guess he felt

16     that the flag was heavy.  I don't think that -- even though

17     the flag, I believe, was lost, so we don't have it for

18     evidence, but I think when he said ten pounds, we're taking

19     that too literally.  There's a video of him showing how you

20     want to have good balance.  He explains it in the video.

21          And I'll say, you know, that -- I mean, there were

22     a lot of people.  I think that there was a comparison made

23     in another case to Jacob Chansley who -- his flag had a

24     spear that was attached to it.

25          I mean, every flagpole is a weapon, technically.

1    It really doesn't matter how heavy it is.  And I'll leave it

2    at that.  The video, I think, speaks for itself, and that's

3    where that is.

4          So -- but even -- let's assume for argument's sake

5    so he brought with him --

6          THE COURT:  Let's move on.

7          MR. GROSS:  I'm moving on.  Exactly.

8          He brought with him the flag pole, and he brought

9    with him the Hike 'N Strike.  He did not bring a gas mask.

10   He did not bring tactical gear, as many people brought.  He

11   did not bring -- the two-way radios, by the way, I should

12   mention, are in his home.  They're on the shelf in his home

13   right now.  The government can go and confirm that.  The

14   two-way radios -- I'm not sure -- whatever it is, the two-

15   way radios are in his home.  The defendant told me that

16   while we were sitting at the desk.

17         Robertson approached the Lower West Terrace and

18   was one of the first people to charge.  He joined in an

19   advancing mob of rioters armed with sticks and other

20   paraphernalia.  Mr. Barnett did not do that.

21         Robertson had law enforcement and combat

22   experience.  Comparing a fireman, a retired fireman who is

23   63 years old, to a law enforcement officer who is also a

24   military veteran and saying, well, basically it's the same

25   thing, I don't agree with that, and that should not be

1    considered.

2            Robertson drove to D.C. with guns.  That's

3    obviously a very significant difference than Mr. Barnett.

4    And Mr. Barnett, although he did go technically together

5    with two other people, they took separate cars.  They were

6    both going.  They were just both from the same town.  It's

7    not -- there's no evidence on those two people.  Even if you

8    wanted to see if there were text messages, the government

9    could have checked their phones.  There was no collusion or

10   coordination between them.  Nothing was alleged that they

11   were a militia coming together.  There was no planning.  He

12   was certainly not a leader, and I think the government

13   agreed to that.

14           At Robertson's sentencing hearing, the Court said

15   that Robertson's case warranted 87 months because it was

16   like Guy Reffitt.  Guy Reffitt was wearing body armor,

17   according to the Court documents.  He was carrying handguns.

18   He was carrying flexi-cuffs.  He reportedly said, quote,

19   We're taking the Capitol before the day is over.

20           Reffitt was at the front of the pack that charged

21   the Capitol Police on the western terrace.  He led the mob

22   up staircases outside the Capitol building.  He urged others

23   to keep moving forward.  He reportedly said, "We took the

24   Capitol of the United States of America, and we will do it

25   again."  After January 6th he allegedly sent messages to

1    everybody to purge their evidence.

2              This doesn't even remotely resemble Mr. Barnett's

3    case at all.

4              Just to bring a few other examples that

5    Mr. Barnett should not be compared to but that shed light on

6    what he is not, I believe Judge McFadden recently said in

7    the case of *Macaughey* -- I think it's 21-USC-40 [sic], I

8    would say -- he said in that case that Macaughey was the

9    poster child, not Mr. Barnett.  Macaughey was in the western

10   tunnel.  I think he pinned an officer to the wall for like a

11   minute or more and was really part of the real violence of

12   January 6th that most of the footage that we see that Judge

13   McFadden called appalling, that was what others were a part

14   of.  He got basically what the government wanted.  I think

15   he got seven and a half months --

16             THE COURT:  Counsel, I'm going to move you on a

17   little bit.  I've read the descriptions in your briefs of

18   all of those cases.

19             MR. GROSS:  So if I can just -- I just added a

20   couple that I thought -- I didn't mention in my brief.  I

21   just want to say if the case that we wanted to compare him

22   to would be -- which I didn't mention in my brief is Emily

23   Hernandez, Paul Westover, William Merry.  Those three came

24   together, entered the Capitol through the broken Senate Wing

25   Doors at 2:20, which was 20 minutes before Mr. Barnett,

1    while the people might have been even still there.  They

2    exited through a broken window at 2:55, unlike Mr. Barnett,

3    who entered as he was instructed.  They were all in the

4    office suites and Rotunda just like Mr. Barnett.

5            Emily Hernandez got a score of 6 and was given 30

6    days.  For that she picked up the sign to the Speaker's

7    office after it was shattered on the floor and she, quote,

8    according to the government, wielded the shard of the

9    Speaker's sign, which in the pictures looks pretty

10   dangerous.

11           She took another sign that said "Keep Off The

12   Fence."  By doing that, she certainly, you know, did

13   something that was worse than Mr. Barnett.  And she took

14   another sign that said "Please Do Not Touch."  For that,

15   like I said, she got 30 days with a score of 6.

16           Paul Westover I think also was a score of 6.  He

17   got 45 days.  He was her accomplice.

18           And William Merry, who was the leader in that

19   case, had a score of 4 only, and he got 45 days.

20           These and other cases are really similar to

21   Mr. Barnett.  He entered the building.  He walked around, he

22   ended up in the Rotunda, and then he left.  The only thing

23   that makes him different is that he had an encounter with

24   Officer Craig for a couple of minutes that was nonviolent,

25   ambiguous, and he had his Hike 'N Strike, which was secured

1    to his belt, covered with his sweater the whole time except

2    for two seconds when he was shoved.

3              Even viewing his conduct in the least favorable

4    light, he is substantially similar to other nonviolent

5    January 6th defendants who were not charged with assaulting

6    officers and who received sentences of days or months but

7    not years.

8              Finally, I just want to address -- as I

9    mentioned -- I want to address, and I'll conclude with this,

10   the appropriate deterrence that the government is concerned

11   with.  The Court stated to Mr. Robertson at his sentencing,

12   "It's not about compliance, but it's about deterrence, the

13   need for me, which is my primary responsibility, to protect

14   the public."

15             Mr. Barnett is 63 years old.  He has lived an

16   exemplary life before and after January 6th.  He was a

17   firefighter.  I'm sure the Court read his character letters,

18   which you said you did, and his family and friends,

19   including law enforcement and military.

20             I was going to show a short 45-second clip that

21   shows him donating $4,600 that he collected in the community

22   to his local police station.  It was on the local news in

23   Arkansas.  And $4,600 doesn't sound like a lot of money, but

24   in Gravette, Arkansas, it is a lot of money.  He worked very

25   hard to get that, and he did it because he supports police.

1    And ultimately what he's being charged with here is not

2    doing that.  So it shows that it was definitely against his

3    character.

4            He is not a danger to the public.  The Court does

5    not need to worry that Mr. Barnett will cause trouble in his

6    few remaining years or answer a call of duty.  He's not

7    looking to answer any calls to duty.

8            He went to January 6th.  It was a terrible and

9    traumatic day.  He regrets that he went there, and it's not

10   something that he intends to ever do again.

11           As far as deterring others, there really is no

12   fear, I would think, that people are going to -- are not

13   afraid -- are not deterred based on the government's

14   response to January 6th.  It's almost three years later, and

15   there are people still being arrested.

16           Richard spent four months in prison.  He spent two

17   years at home under strict conditions.  He lost his job.  He

18   lost all of his money.  He has nothing left.  His lawyers

19   are working for free.  Just the anticipation of this

20   sentencing, knowing that he could spend seven years in

21   prison, is a punishment that most people cannot even

22   imagine, especially for a 63-year-old man where those could

23   be the last seven years of his life.

24           And let's remember, no matter what the government

25   wants to say, Richard Barnett's part in January 6th is

1      not -- he was not the mastermind of this.  He was not the

2      worst of the violence.  He was not the poster boy by any

3      stretch of the imagination.

4               We -- the government told the Court -- and, once

5      again, I'm finishing, I'm concluding -- that the reasons

6      that Mr. Barnett deserves the maximum sentence, Page 2 of

7      their sentencing memo, is a photo of Mr. Barnett with his

8      feet on a desk in the House Speaker's office suite.  It was

9      widely circulated and became one of the best-known images of

10     that day symbolizing the rioters having wrested control of

11     both the hallowed space and the political process from the

12     nation's elected leaders.  Mr. Barnett should not be

13     punished because the government thinks he's a symbol.

14               On Page 12 of the government's sentencing memo, in

15     totality, Barnett's actions in Speaker Pelosi's office were

16     similar to his conduct when he arrived in D.C., just as he

17     bragged about urinating on the fire hydrants to mark his

18     territory in the most vulgar, disrespectful way possible, he

19     behaved the same in Speaker Pelosi's office.  Mr. Barnett

20     should not be punished because the government thinks he's

21     vulgar.

22               All Mr. Barnett asks is to be sentenced fairly.

23     Not as a symbol.  Not as a January 6th defendant.  Just as

24     any American, he should get equal protection under the law

25     and not be excessively punished for reasons unrelated to his

1    specific conduct.  The punishment he has already received

2    should be sufficient, but more than another 6 to 12 months

3    would be excessive.

4             Thank you, Your Honor.

5             THE COURT:  Thank you.  All right.

6             Before I hear from Mr. Barnett, if he's prepared

7    to address the Court or not, I'm not sure, Ms. Prout, if you

8    could come back to the lectern.

9             Mr. Gross covered a lot of territory.  I don't

10   want you to reargue any of the points in your memos, but he

11   did raise a couple of points that I don't believe were

12   briefed regarding charging decisions the government may have

13   made in other cases.

14            In fairness, I'll give you an opportunity to

15   address that.  I also want to ask you about the fine figure

16   that you have recommended as well as the restitution figure.

17            MS. PROUT:  Thank you, because I did neglect to

18   cover those.

19            With regard to the other cases, I don't think

20   there were any specifics that were raised that were

21   sufficient for the government to respond to at this point.

22   There were obviously other people in the Speaker's office.

23            THE COURT:  Other cases, I meant other non-January

24   6th cases.

25            MS. PROUT:  Oh, oh, I see.

1          Again, I think, as Your Honor pointed out, in many

2     of those cases they've been prosecuted by the state.  In

3     many of them there may not even be a federal nexus to bring

4     federal charges, making it very difficult to compare let

5     alone look at the individual characteristics.

6          THE COURT:  And am I correct that there are --

7     there have been scores of federal cases across the country?

8          MS. PROUT:  That's my understanding, but I can't

9     provide numbers, Your Honor.

10          Did you have further questions on that?

11          THE COURT:  No.  It's up to you.

12          MS. PROUT:  Okay.  With regard to the fine, I did

13     fail to mention that there have been several ways in which

14     the defendant has attempted to raise money following his

15     conduct on January 6th.  There are several GiveSendGo

16     accounts that were formed by him and on his behalf that have

17     raised a total of a little bit over $25,000 to date.

18          The defendant also had a website.  I think it was

19     BigoBarnett.com.  It appears to no longer be on the

20     Internet, but for some period of time he was offering to

21     sell signed photographs of him in the Speaker's office in

22     exchange for money.  So he has attempted to profit in that

23     way.

24          But the fine request is based specifically on the

25     approximately $25,000 that he raised in those GiveSendGo

1    accounts, Your Honor.

2             THE COURT:  Okay.  On the restitution, I know that

3    $2,000 is the standard amount for folks who have entered

4    pleas.  I have to make a finding under either the Mandatory

5    or Discretionary Victims Restitution Acts, and usually I

6    will get as part of the government's presentation a letter

7    from the Architect of the Capitol that estimates the amount

8    of damage.  Unless I missed it, I did not see one here.

9             MS. PROUT:  We did not submit a letter, Your

10   Honor.  We did include in our sentencing memorandum the

11   current estimate by the Architect of the Capitol, which I

12   want to say is over $2 million at this point.

13            THE COURT:  I think it's $3 million.  But the

14   question is:  Can I take that as -- can I take that proffer

15   or perhaps look to findings in other cases as a sufficient

16   basis to order that $2,000 restitution?

17            MS. PROUT:  I think Your Honor can take judicial

18   notice of findings in other cases as well as the evidence in

19   this case which established the extensive damage done to the

20   building.

21            THE COURT:  Okay.  Very well.  Thank you.

22            All right.  Mr. Barnett, anything you'd like to

23   tell me before I pronounce your sentence?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  Why don't you come to the lectern with

1    your counsel.

2              THE DEFENDANT:  Thank you.

3              Your Honor, first off, I want to apologize.  I

4    didn't know I couldn't walk up here to hand him a note.  It

5    was just...

6              Before I read this, I just did want to mention

7    that the GiveSendGos were created by Joe McBride, and he

8    kept all that money for attorney fees, and he created that

9    thing about a picture and the money.  We never went through

10   with that.  But that had nothing to do with me.  That's him.

11             So I don't have a job.  I have very limited income

12   coming in so...

13             Over the course of this trial I do think you've

14   gotten to know me a little bit.  We spoke briefly up there.

15   You've read my family's letters and all that.  You let me

16   out, and I earned your trust.  I behaved perfectly while I

17   was out.  You've gotten those reports.

18             If you can find it in your heart to give me

19   probation, I will continue to do the same as I've done my

20   whole life.  63 years.  This was an enigma in my life, and I

21   think that you probably get that feeling.

22             I know that some of my actions at January 6th are

23   hard to explain because I'm not an attorney.  I can't get

24   all this from either side, all this stuff that's going on.

25   I just can't.

1          You know, they want to say I don't have memory

2     problems.  I do.  I've had a lot of head injuries.

3          But -- they say I'm not remorseful, but listen to

4     what they want me to be remorseful for.  They say I'm a

5     terrorist.  You know I'm not.  You've let me go home.  I've

6     stayed in Washington, D.C., the only one allowed to do that.

7     And I can't -- you know, I can't express remorse for being

8     one.

9          Then they say I'm vulgar.  That's their opinion.

10    Sometimes when I'm mad, I am vulgar, but I think you said

11    yourself during Robertson's sentencing that this is not

12    about getting me or him to heel or to break me.  They want

13    me to be remorseful for things I did not do.

14         And obviously I'm appealing this case.  So on

15    appeal I still think I have a chance to prove that I'm

16    innocent.  It seems counterproductive to say anything other.

17         They offered me a plea deal a long time ago, seven

18    years, and I don't know how I could have possibly accepted

19    that.  I didn't do anything that deserves seven years in

20    prison.  And so I plan on appealing this because I think I

21    wasn't treated fairly.  The government misconstrues every

22    word I say.

23         So I hope you understand the situation I'm in.

24    It's a tough one.

25              THE COURT:  Okay.

1          THE DEFENDANT:  As you had said in the Robertson

2    sentencing, this is not about extracting a confession out of

3    me.  This is about your duty to protect the public.  And I

4    hope you understand greatly that I respect that duty.  I

5    really do.  And I respected you in the court, and I think

6    I've shown you respect the whole time, and you have me.

7          I don't think it is in dispute that I admire and

8    support law enforcement.  You saw me donating the money for

9    body cameras.  I've done Toys for Tots.  I've done many

10   things.  A lot of the letters express who I really am.

11         And I'm not going to get into -- I'm just going to

12   skip that part.

13         January 6th was a traumatic day for everyone, not

14   just law enforcement.  Although there was -- you know, they

15   were traumatized, but it was for everyone.  There were a lot

16   of people there.  A lot -- there were people that wanted to

17   instigate.  There were people that got caught up in it.

18         I saw with my own eyes -- and this is hard for me

19   because nobody seems to believe this, and you don't know how

20   you're going to handle trauma, but I saw with my own eyes

21   law enforcement shooting concussion and smoke grenades deep

22   into a crowd of peaceful protesters.  It shocked me to the

23   core.  It really did.

24         I was angry that day.  I admit I was angry, and I

25   apologize for that.  But those were traumatizing

1    circumstances that day for myself and everyone there.

2         Whatever the Court believes I did in those videos,

3    all I ask is that the punishment be appropriate.  Everyone

4    sees things differently.  I'm not proud that I watched

5    myself carrying on in front of Officer Craig, but I

6    certainly did not intend to threaten him or cause any of the

7    officers harm.

8         I understand that the Court and the government

9    sees things differently, and sometimes even differently from

10   each other.  But whatever the Court thinks I did, even

11   viewing it in this worst light, it was not worse than the

12   people who received days in prison in his examples,

13   especially given the totality of my life.

14        All I ask of you is to be fair and put these few

15   minutes in context in the totality of my 63 years, because

16   this is an enigma.

17        And I thank you, Judge, and I respect whatever you

18   decide.

19        THE COURT:  Okay.  Thank you.  Why don't you have

20   a seat.

21        All right.  Mr. Barnett, you know we have hundreds

22   of these cases, and every one of them is different.  Every

23   defendant's role is different.  We had discussed at length

24   at trial, in the post-trial motions, in the sentencing

25   papers, and here in court today what your particular role

1    and responsibility was that day.  And I can assure you that

2    I have tried my best, as I do in all cases, to consider all

3    of the relevant factors, and there are a lot of them.  All

4    right?

5              THE DEFENDANT:  Yes.

6              THE COURT:  And not just that you were the guy who

7    happened to be on the front of *The New York Times* with his

8    boots on the desk.  All right?

9              THE DEFENDANT:  Yes.

10             THE COURT:  I have to -- I'm not a judge that

11   lectures people, but I do try to explain how I have gotten

12   where I've gotten.  All right?  I think I owe you that, and

13   I owe the public that.

14             And among the factors that we have to consider, we

15   have to start with those guideline ranges that we've talked

16   so much about.

17             THE DEFENDANT:  Yes.

18             THE COURT:  And it sounds like a lot of math, but

19   there are facts behind the math, and there are circumstances

20   behind the math, and your range is 70 to 87 months.  Now,

21   you know, your attorneys and I might disagree about what

22   that range is and how we calculated it and, you know, if you

23   want to take that to the Court of Appeals, you certainly

24   can, but I have found that based on a faithful application

25   of this book right here that 70 to 87 months is -- has to be

1    my starting point.  Okay?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  And that's a long time.

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  It's long because it reflects the

6    seriousness of the offenses that you were convicted by the

7    jury on, which I'll get to in a minute.  But as I've said,

8    it's also significantly driven by that eight-level

9    enhancement for threatening to cause physical injury to, in

10   this case, Officer Craig in order to obstruct the

11   administration of justice.  All right?  And without that

12   enhancement, that 70 to 87 range would be 30 to 37.  So it's

13   doing a lot of work here.  All right?

14             Also doing a lot of work is the fact that you

15   chose to go to trial.  And that's your right, and I don't

16   hold it against you, but as a result, you don't benefit from

17   a three-level decrease in your guidelines level for

18   acceptance of responsibility.

19             And even with that eight-level enhancement, if I

20   were to consider that whole thing, your range still would

21   have been 51 to 63, which is about a year and a half lower

22   than had you accepted responsibility through entering a

23   guilty plea.  All right?

24             So I mention that just to sort of put these

25   guidelines calculations in some context.  All right?

1          Moving to the nature and the seriousness of the

2     offenses of your conviction, you know, let's start with why

3     you came to D.C.  I don't believe that it was just to

4     peacefully attend the former president's last rally on the

5     Ellipse.  You knew when you got in your car in Gravette that

6     a certification was going on, and that certification wasn't

7     on the Ellipse, it was in the Capitol.  And you believed or

8     at least you said you believed that the election had been

9     stolen and something needed to be done about it.

10          And you shared on social media posts urging people

11     to, quote, occupy the Capitol, and, quote, overthrow the men

12     who pervert the Constitution.  All right?  And that perhaps

13     is not evidence that you planned an insurrection, but in my

14     view it's certainly evidence that you knew that this was not

15     just a rally on the Ellipse but that the events that were

16     going on in the Capitol was where the action was.  All

17     right?

18          And we've talked about your social media posts;

19     and I agree with Mr. Gross that they were less incendiary

20     and belligerent than some others I've seen in these cases.

21     But, again, they do show that the focus of your attention

22     was the Capitol and not just hearing from the former

23     president.  And I think you knew that breaching the Capitol

24     was at least potentially in the cards when you came to D.C.;

25     in other words, it was not a spur-of-the-moment reaction to

1    getting swept up in the crowd after the rally ended, which

2    is the case for many January 6th defendants that I see.

3         As Ms. Prout said, you also armed yourself for

4    violence; the stun gun, the metal pole.  I don't accept that

5    you need a ten-pound metal pole to support a flag.  And you

6    have a YouTube video showing yourself carefully wrapping it

7    and calling it a -- I believe "a freedom implement," or at

8    least adopting the terms that someone else used to that

9    effect.

10         Once you were here, you told everybody who would

11   listen that you weren't here to play.  "We own D.C.  It's

12   ours."  All right?  That doesn't sound like just attending a

13   nice peaceful rally by the former president.

14         As we've talked about, you joined the crowd in

15   front of the Columbus Doors and were in the first wave

16   through those doors after a fellow protester opened them

17   from the inside.  I listened to the testimony.  I looked at

18   the videos numerous times.  I don't think you were pushed in

19   or swept in.  You were an active participant, not a passive

20   bystander caught up in events.

21         As for your stay in Speaker Pelosi's office, I

22   don't think that was unintentional either.  You weren't just

23   lost and looking for a bathroom, as I believe you testified

24   at trial.  You knew where you were.  And totally putting

25   aside how that photo came to be taken, one of the factors

1    that we consider in all of these cases is whether folks

2    ventured into private, sensitive areas of the Capitol or

3    simply stayed in the Rotunda or other public areas or areas

4    that would have been public but for what was going on that

5    day.

6              And you brought a stun gun into her inner offices,

7    which it may be legal to have them in D.C., but it certainly

8    wasn't legal to have them in the Speaker's office, and it

9    was obviously very dangerous.  And I shudder to think what

10   would have happened if those staff members who were in the

11   conference room were in the office or, God forbid, if the

12   Speaker were there.

13             Moving to your encounter with Officer Craig, as I

14   stated in the order of yesterday, and it's laid out there, I

15   think the evidence was more than sufficient to establish

16   that you impeded his ability to respond to what was a very

17   serious situation.  You threatened him both verbally and by

18   flashing your stun gun.  It may not have been exposed for

19   long, as Mr. Gross said, but it was long enough for him to

20   see it and to get the message.

21             That said, fortunately, you didn't assault him or

22   anybody else, nor did you damage any property except for the

23   envelope.  But I'll put that aside.  All right?

24             So that brings me to that eight-level enhancement.

25             You know, as I said, in the government's

1    presentation, you know, there's a lot of conduct that is

2    encompassed within those eight levels.  It ranges from idle

3    nonverbal threats to, you know, shooting a witness and all

4    things in between.  And I don't think your conduct falls at

5    the high end, and I don't think it's in the low end either.

6    I think it's probably somewhere in the middle given all of

7    the conceivable circumstances someone in the Capitol could

8    have found himself in and then later be charged with that

9    particular offense.

10            So I do think that a variance from the guidelines

11   range based on the fact that the eight-level enhancement

12   overstates the seriousness of your conduct is appropriate.

13            Let's talk about acceptance of responsibility,

14   which is another factor the Court has to consider.  You

15   obviously chose to go to trial, which is your right, but as

16   a result, you don't get guidelines credit for accepting

17   responsibility.

18            And on a more fundamental level, while you may

19   regret having been there that day and regret the effect that

20   your involvement had on your life and that of your family,

21   you have far from shown any true acceptance of

22   responsibility for your actions.  And I think you admit

23   that.

24            By contrast, you tried to conceal your culpability

25   after you knew that the FBI was going to come looking for

1    you.  And even more concerning, you lied about it under oath

2    here at trial.  All right?

3              And, you know, you're going to disagree with me,

4    but the stun gun didn't short out because you dropped it in

5    the shower.  All right?

6              You didn't join the crowd in front of the Rotunda

7    because you were looking for your buddies.  You weren't

8    pushed in.  The cap of the gun didn't just fall off.  It

9    didn't go missing because somebody stole it.  Your phone

10   didn't slide off the top of the car.  And I could go on.

11             And I could be wrong, but I think you know as well

12   as I do that none of those things happened, yet you sat

13   here, and you raised your right hand, and you took an oath,

14   and you said all those things, which, in my view, shows an

15   utter disrespect for the legal system and why you're here.

16   And it is an affront to me and to, most importantly, the

17   citizens who sat here as jurors for two weeks of their time.

18             Another aspect of acceptance of responsibility

19   that we consider is acknowledging the effect that your

20   conduct has had on other people.  And I've not heard

21   anything about the victims of that day, about the five

22   people who died, about the four law enforcement officers who

23   committed suicide soon after January 6th.  And I'm sure

24   there is some theory out there that, you know, there's no

25   connection whatsoever, that it didn't cause any of those

1      things, but, you know, be that as it may.

2              No regret about the young staff members who were

3      locked in that conference room down the hall not knowing if

4      they'd come home that day or knowing whether somebody would

5      charge in with a gun or a ten-pound pole or a stun gun.

6      Instead, you told me that they should just have kept on

7      working.

8              And I know that Ms. Prout mentioned that, and I

9      saw some consternation on the other side with the suggestion

10     that you may not have said that, but let me just read from

11     the post-trial motion that we received:  The persons hiding

12     in locked conference -- in the locked conference room chose

13     to hide when they were never personally threatened.  They

14     could have locked their office doors and stayed at work.

15     There was not a single incident on January 6th where any

16     civilian staff was injured by a protester.  Any work by

17     Pelosi's staff was stopped by their own fear and not by

18     anything Mr. Barnett said or did.  In fact, Ms. Berret, who

19     is Ms. Pelosi's chief of staff, was the one responsible,

20     according to her testimony, for the staff stopping her work

21     and then cowering in fear in a locked conference room.

22              That's a remarkable statement, and I hope you

23     didn't read that before it was filed.

24              THE DEFENDANT:  I didn't agree with it.  My

25     counsel wrote it.

1          THE COURT:  All right.  And it's of a theme.  It's

2     not acknowledging the effect that your conduct had on other

3     people and blaming others for what you, along with a lot of

4     other folks, were responsible for that day.

5          Nor have I heard anything about how your conduct

6     affected the democracy and the Constitution that you say you

7     love so much.  During trial, when you were on the stand,

8     Mr. Gordon cross-examined you, and you talked about how much

9     you love the First Amendment and the Second Amendment, and I

10    believe that.

11         And then he asked you what I thought was somewhat

12    of a trick question.  He asked you whether you knew what the

13    Third Amendment was, and I would dare say that there are a

14    lot of lawyers and even judges who couldn't recall the Third

15    Amendment right off.  It deals with quartering soldiers, by

16    the way.

17         But he also asked you about the Twelfth Amendment,

18    right?  And that's the part of the Constitution that

19    establishes the electoral count that was going on that day

20    and that you have been convicted of obstructing.  And you

21    didn't seem to know much about that, but it enshrines and

22    codifies one of the features of our system of government

23    that distinguishes us from other countries, and that's the

24    peaceful transfer of power.  And you and your fellow rioters

25    tried to rip that amendment out of the Constitution through

1    violent means.  And I say it because we all love the

2    Constitution, but we can't just pick and choose the parts of

3    it that we want to defend.

4         And as Mr. Gross mentioned, we don't talk about

5    acceptance of responsibility just for its own sake.  It

6    is -- we talk about it because it affects deterrence.  It's

7    related to the need to encourage deterrence, to promote

8    deterrence, and to promote respect for the law.  And there

9    is specific deterrence, which is how likely are you to do

10   something like this in the future, and then there's general

11   deterrence, which is about deterring other people besides

12   you.

13        As for you, you know, frankly, that's not an easy

14   question in this case.  On the one hand, you're 63 years

15   old.  You're too old for this nonsense.  All right?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  You have no prior criminal history,

18   and maybe I'm wrong, but you strike me more of a talker --

19        THE DEFENDANT:  Yes, sir.

20        THE COURT:  -- than a doer.  All right?

21        THE DEFENDANT:  Yes, sir.

22        THE COURT:  But on the other hand, you know, for

23   better or for worse, you have become one of the faces of

24   January 6th.  All right?  And I think you kind of enjoy that

25   notoriety.  You're not just Richard, but you're Bigo, which

1    you said on the stand was almost an alter ego.  You want to

2    be the center of attention.  You even tried to profit from

3    your involvement, as Ms. Prout mentioned, by selling

4    autographed copies of *The New York Times* photo to supporters

5    and copyrighting your completely disrespectful message to

6    Speaker Pelosi.  And I can see those impulses leading you to

7    answer, if not the next call like this, at least something

8    similar in some respect.

9          As for general deterrence, what your sentence says

10   to other people, I think there are lots of them out there

11   across the political spectrum who might be inclined to cross

12   the line between legitimate First Amendment expression and

13   breaking the law, and, again, you have made yourself one of

14   the faces of J6 not just through that photo, but using your

15   platform and your notoriety to peddle the misconception that

16   you and other J6ers are somehow political prisoners who are

17   being persecuted for your beliefs as opposed to your conduct

18   on January 6th.  So to all those folks who follow Bigo, they

19   need to know that the actions of January 6th cannot be

20   repeated without some serious repercussions.

21         Let me just say, too, you know, in terms of

22   shifting blame to other folks, you know, I've heard a lot

23   about how the police that day were responsible for shooting

24   mace or pellet guns or incendiary devices into the crowd.  I

25   say this to a lot of defendants.  I'm not singling you out.

1    But we are all very fortunate that law enforcement -- at the

2    restraint that law enforcement exhibited that day.  It is a

3    miracle to me, having seen all of the videos, that more

4    people did not perish.

5          And, you know, when you're in the Capitol and

6    you're knocking on doors and hooting and hollering, the fact

7    that it didn't draw a stronger and more dangerous reaction

8    from the Capitol Police and the FBI and the MPD is a real

9    miracle to me sometimes.  So -- and I hope folks, you know,

10   think about that and consider how much more dangerous it

11   really could have wound up.

12         We also have to consider, you know, your history

13   and who you are as a person.  As has been mentioned, you

14   don't have a criminal record.  You have a relatively

15   stable -- or you've had a relatively stable professional and

16   personal life until these events.  Nothing in your personal

17   background that would explain your illegal conduct on

18   January 6th.

19         I've read your letters.  I have no doubt that

20   you're a good family man and that you are a close friend to

21   many.  I was particularly struck by the letters from your

22   brother John and your nieces.  I know that there is good in

23   your heart, and that you are generous with your time and

24   with your money.  I don't doubt that at all.

25         But as with many defendants, you know, that part

1    of you is completely at odds with the criminal conduct and

2    the disrespectful -- and I think "vulgar" is a perfectly apt

3    term -- behavior that you exhibited on January 6th.

4          In terms of disparities, we've talked a lot

5    about -- you know, I've had seven trials.  Probably 40 or 50

6    sentences.  No two cases are exactly the same, but we try

7    our best to consider the facts of each one and to avoid

8    undue disparities.  And the key word is "undue" because this

9    is not a mathematical exercise.  It is inevitable that some

10   people will second guess a sentence and say, Well, this

11   person really deserved more time and that person deserved

12   less.  And I think all of my colleagues try to calibrate

13   sentences so that folks fit in where we really think they

14   should.

15         I'm not going to compare all of the exemplars

16   cited in the papers and here in court.  Just as a general

17   matter, I think that your conduct falls below defendants who

18   were leaders and organizers and who physically assaulted

19   police officers.  But it falls above, obviously, people who

20   simply attended the rally and for whatever reason decided to

21   enter the Capitol, especially those who did not break

22   anything and enter any sensitive areas.

23         Within that middle area where you fall compared to

24   others is influenced by all of the factors that we have

25   discussed:  the fact that you carried and flashed a

1    dangerous weapon; that you interfered with law enforcement;

2    that you went and stayed in sensitive areas of the Capitol;

3    and that you chose to go to trial and have exhibited little

4    or no acceptance of responsibility; and your testimony here

5    at trial.

6              As for specific cases, I think you all have both

7    identified the *Robertson* case as being, you know, analogous

8    in some respects but, I think Mr. Gross is right, not

9    analogous in others.  As I've said, the charges were

10   similar.  He, too, had no criminal history.  He also went to

11   trial.  He had a slightly higher guidelines range because he

12   brought others with him.

13             As I said, as here, I would have varied downward

14   because I thought the eight-level enhancement overstated the

15   seriousness of his conduct.  The only reason I did not was

16   because of his post-indictment conduct, which involved

17   assembling a number of semiautomatic rifles that I thought

18   he was prepared to use.

19             Mr. Barnett, while some of your post-indictment

20   conduct has not been commendable, particularly your

21   testimony on the stand, it does not rise to that level in my

22   view.

23             So considering all of these factors, and

24   consistent with the probation office's recommendation, I

25   believe that at least some variance from the applicable

1    guidelines range is appropriate.

2              So with that, sir, if you could stand with your

3    counsel.

4              Pursuant to the Sentencing Reform Act of 1984 and

5    in consideration of the provisions of 18 USC 3553, as well

6    as the advisory Sentencing Guidelines, it is the judgment of

7    the Court that you, Richard Barnett, are hereby committed to

8    the custody of the Bureau of Prisons for concurrent terms of

9    54 months on Counts 1, 2, 3, and 4, six months on Counts 5,

10   6, and 7, and 60 days on Count 8.

11             You are further sentenced to serve a 36-month term

12   of supervised release as to each of Counts 1, 2, 3, and 4,

13   and one year on Count 8, with such terms to run

14   concurrently.

15             In addition, you are ordered to pay a special

16   assessment of $100 per count on Counts 1, 2, 3, and 4, $25

17   on Count 8, and $10 on Counts 5, 6, and 7, for a total of

18   $455, in accordance with 18 USC 3013.

19             While on supervision, you shall abide by the

20   following mandatory conditions as well as all discretionary

21   conditions recommended by the probation office in Part D of

22   the sentencing options of the presentence report which are

23   imposed to establish the basic expectations for your conduct

24   while on supervision.  The mandatory conditions include:

25             You must not commit another federal, state, or

1    local crime.

2            You must not unlawfully possess a controlled

3    substance.

4            You must refrain from any use of a controlled

5    substance and submit to one drug test within 15 days of

6    placement on supervision and at least two periodic tests

7    thereafter as determined by the Court.

8            You must cooperate in the collection of DNA as

9    directed by the probation officer.

10            You must make restitution in accordance with 18

11    USC 3663 and 3663(a) or any similar statute authorizing a

12    sentence of restitution.

13            You shall comply with the following special

14    conditions.

15            Ms. Baker, you've recommended a substance

16    abuse testing condition.  I don't need to impose that on

17    Mr. Barnett, do I?

18            THE PROBATION OFFICER:  Your Honor, you can very

19    well not impose it and just have the mandatory what you

20    stated in I believe No. 3.

21            THE COURT:  No. 3.  There's not a special

22    condition for substance abuse testing.

23            Financial information disclosure.  You must

24    provide the probation office access to any requested

25    financial information and authorize the release of any

1    financial information.  The probation office may share

2    financial information with the U.S. Attorney's Office.

3           Financial restrictions.  You must not incur new

4    credit charges or open additional lines of credit without

5    the approval of your probation officer.

6           The Court finds that you do not have the ability

7    to pay a fine and therefore waives imposition of any fine in

8    this case.

9           As for restitution, the Court finds that at least

10   one of the counts, the 1752 count, triggers mandatory

11   restitution under the Mandatory Victims Restitution Act.

12   The government has shown by preponderance of the evidence,

13   namely information admitted in other cases and proffered in

14   the government's sentencing memos, that the Architect of the

15   Capitol and other entities responsible for the Capitol have

16   indicated that the riots caused over $3 million in damage at

17   least.  The Court finds that those agencies were the victims

18   of the riots as contemplated by the statute.

19          The government has further established that $2,000

20   is a reasonable estimate of how much of that damage should

21   be apportioned to the defendant, which is consistent with

22   what other defendants have agreed to as part of their pleas.

23          Those restitution payments shall be made to the

24   Clerk of the Court of this court for distribution to the

25   Architect of the Capitol.  The address will be in the J&C.

1           Payment during the term of supervised release will

2    commence within 60 days after release from imprisonment.

3    The Court will set the payment plan based on an assessment

4    of the defendant's ability to pay at that time.

5           The probation office shall release the presentence

6    investigation report to all appropriate agencies, including

7    the United States Probation Office in the approved district

8    of residence in order to execute the sentence of the Court.

9           Mr. Barnett, you have the right to appeal your

10   conviction of guilt to the U.S. Court of Appeals for the

11   D.C. Circuit pursuant to 18 USC 3742(a).  You also have a

12   statutory right to appeal your sentence to the D.C. Circuit

13   under certain circumstances if you think the sentence was

14   imposed in violation of law or as a result of an incorrect

15   application of the Sentencing Guidelines or is more severe

16   than the maximum established in the guidelines range.  You

17   may also appeal your sentence if you believe you received

18   ineffective assistance of counsel at sentencing.

19          Pursuant to 28 USC 2255, you also have the right

20   to challenge the conviction entered or the sentence imposed

21   to the extent permitted by that statute.  Any notice of

22   appeal must be filed within 14 days of entry of judgment or

23   within 14 days of the filing of a notice of appeal by the

24   government.

25          If you are unable to afford the cost of an appeal,

1    you may request permission from the Court to file an appeal

2    without cost to you.  On appeal you may also apply for

3    court-appointed counsel.

4              You can be seated.

5              Any other objections for the record, Counsel?

6              MS. PROUT:  Not for the government.

7              THE COURT:  Mr. Gross?

8              MR. GROSS:  No objections.

9              THE COURT:  Okay.  Do you have a placement

10   recommendation for me?

11             MR. GROSS:  Yes, I do.  Should I go there?

12             Before I give the placement recommendations, I

13   just want to request from the Court, just like you did after

14   trial, if Mr. Barnett can self-surrender and return home to

15   close up his affairs and do what he needs to do before his

16   sentence.

17             MS. PROUT:  Your Honor, we do note that detention

18   is mandatory under the statute 3142(b) post-sentencing

19   unless there's a substantial question making reversal

20   likely, and so the government would ask that that statute be

21   applied.

22             THE COURT:  Very well.  The Court will make a

23   finding by clear and convincing evidence that there's no

24   evidence that -- the defendant is not a risk of flight or

25   dangerousness to the community and will allow him to self-

1    surrender.

2              MR. GROSS:  Thank you, Your Honor.

3              THE COURT:  And, Mr. Barnett, obviously you will

4    get a notice as to where to report.  I don't have to tell

5    you to follow that notice.

6              THE DEFENDANT:  Yes, Your Honor.  I've done

7    everything you told me.

8              THE COURT:  That would not be prudent, to

9    disregard that.  Okay?

10              THE DEFENDANT:  Yes.

11              MR. GROSS:  So we came with a few recommendations

12   in the following order.  The first one is FPC Yankton

13   prison.  It's in South Dakota.  And we like that one because

14   it has all kinds of opportunities for the defendant to train

15   in different vocations.  It's also, I think, as you

16   mentioned, that -- I don't think that we are concerned in

17   terms of him being a threat to society.  It is minimum

18   security, and I believe this is the one that -- it has

19   educational services, psychological.  It's very good for his

20   health, we think, and a wide range of activities that I

21   think would be good for psychological health, for his

22   physical health, and I believe...

23              (Counsel confers with defendant)

24              MR. GROSS:  Mr. Barnett has experience training

25   dogs, and they do that there, and it's also on a college

1    campus --

2              THE COURT:  Let me just say that, you know, first

3    of all, BOP will decide his placement.  The Court --

4              MR. GROSS:  Okay.

5              THE COURT:  -- in most cases will make a

6    recommendation, but that is nonbinding.  It is up to BOP --

7              MR. GROSS:  Got it.

8              THE COURT:  -- where to place him.

9              And picking a prison ain't like picking a hotel.

10   All right?

11             MR. GROSS:  I understand.

12             THE COURT:  You don't go through all the amenities

13   and choose one.

14             MR. GROSS:  Okay.  So we'll just --

15             THE COURT:  So you might be better off, you know,

16   telling me to make -- base the recommendation perhaps based

17   on proximity to family or a criteria that BOP is more likely

18   to recognize than simply what he likes.  Okay?

19             MR. GROSS:  In terms of proximity to family, you

20   know, it's as accessible as anywhere basically.  But for

21   all --

22             THE COURT:  Go ahead.

23             MR. GROSS:  Yankton Prison Services is the one we

24   recommend first.

25             The second one is FPC Pensacola.  And the third

1    one is FPC Montgomery.

2              THE COURT:  Very well.

3              MR. GROSS:  If you're making the recommendation,

4    Yankton is where he would prefer to end up.

5              THE COURT:  Okay.  Anything else, Counsel?

6              MS. PROUT:  Not from the government.

7              THE COURT:  Okay.  Mr. Barnett, good luck to you,

8    sir.

9              THE DEFENDANT:  Thank you.

10             THE COURT:  I tell most of my defendants that they

11   should not be judged by the worst thing that someone has

12   said that they've done or what they've done, all right, and

13   that certainly applies to you.  You've got a lot of people

14   who seem to like you, and hopefully you can use this

15   experience to come out in a better place.  All right?

16             THE DEFENDANT:  Thank you, Your Honor.

17             THE COURT:  All right.  We're adjourned.

18             (Whereupon the hearing was

19              concluded at 4:55 p.m.)

20

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 19th day of June, 2023.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25